**Henry ENDO and John Lesch, Plaintiffs,**

v.

**John M. ALBERTINE, et al., Defendants.**

**No. 88 C 1815.**

United States District Court, N.D. Illinois, E.D.

Jan. 29, 1993.

---

Dennis A. Bell, Paul Felton Harvey, Bell & McGurk, Ltd., Terry Rose Saunders, Arthur T. Susman, P. Terrence Buehler, Susman, Saunders & Buehler, Charles J. Schneider, Daluga & Schneider, Ltd., Chicago, IL, for plaintiffs.

Donald E. Egan, Cook, Egan, McFarron & Manzo, Ltd., Bonita L. Stone, Lee Ann Watson, Katten, Muchin & Zavis, Chicago, IL, for defendants John M. Albertine, Leon D. Black, Richard M. Cion, William F. Farley, William K. Hall, Douglas M. Finney, Robert J. Meier, Fruit of the Loom, Inc.

James Andrew Klenk, Bernard J. Nussbaum, Sonnenschein, Nath & Rosenthal, Chicago, IL, Joel M. Leifer, New York City, for defendants Drexel Burnham Lambert, Inc., Merrill Lynch Capital Markets, E.F. Hutton & Co., Inc., Shearson Lehman Hutton, Inc., Dean Witter Reynolds, Inc.

Robert D. McLean, John M. George, Christopher W. Frost, Jeffrey R. Tone, Sidley & Austin, Chicago, IL, for defendant Arthur Andersen & Co.

Jerold Sherwin Solovy, Joel J. Africk, Jenner & Block, Patricia A. McGovern, Carl D. Liggio, Arthur Young & Company, New York City, for defendant Arthur Young & Co.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

### I. *Background*

Plaintiffs Henry T. Endo ("Endo") and John Lesch ("Lesch")[1] brought this action against defendants Fruit of the Loom, Inc. ("Fruit of the Loom" or "the Company"), various directors and officers of Fruit of the Loom (collectively "Officer and Director defendants") including William F. Farley ("Farley"), John M. Albertine ("Albertine"), William K. Hall ("Hall"), Richard M. Cion ("Cion"), Leon D. Black ("Black"), Douglas M. Kinney ("Kinney"), and Robert J. Meier ("Meier"), accounting firms Arthur Andersen & Co. ("AA & Co.") and Arthur Young & Co. ("AY & Co."), investment banking firms Drexel Burnham Lambert, Inc. ("Drexel Burnham"), Merrill Lynch Capital Markets ("Merrill Lynch"), E.F. Hutton & Co., Inc. ("E.F. Hutton"), Shearson Lehman Hutton, Inc. ("SLH"), and Dean Witter Reynolds, Inc. ("Dean Witter"), alleging nine counts involving securities fraud. Plaintiffs allege that, through a March 3, 1987 Registration Statement and Prospectuses, the various defendants disseminated false and misleading statements or omitted to disclose material facts in relation to a public offering of securities made by Fruit of the Loom on March 3, 1987. Specifically, the plaintiffs allege that all of the various defendants violated § 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder (Count I), § 11 of the Securities Act of 1933 (the "1933 Act") (Count II), committed common law fraud (Count IV), violated the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Consumer Fraud Act") (Count V), acted negligently (Count VI), violated § 12 of the Illinois Securities Law of 1953 (the "Illinois Securities Law") and violated § 17(a) of the 1933 Act (Count VIII). Plaintiffs also allege that "certain identified defendants" violated § 12(2) of the 1933 Act (Count III) and that the Fruit of the Loom Officer and Director defendants breached their fiduciary duties of care, of undivided loyalty and of full disclosure of all material and germane facts (Count IX).

All of the defendants filed motions to dismiss the action against them. These motions were referred to Magistrate Judge Rosemond for a Report and Recommendation ("R & R"). Magistrate Judge Rosemond entered his R & R recommending that this court dismiss plaintiffs' Complaint. The plaintiffs subsequently submitted their objections to the R & R and the defendants responded with memoranda in opposition to plaintiffs' objections.[2] It is these objections and responses which are currently before the court.

For the reasons set forth below, the court sustains some of plaintiffs' objections and overrules others and dismisses part of plaintiffs' Complaint.

### II. *Facts*

This case arises from a · Registration Statement and Prospectuses issued by Fruit of the Loom on March 3, 1987. On that same date, Fruit of the Loom made a public offering consisting of 31,050,000 shares, including over-allotment options at $9.00 per share, of Class A Common Stock, $60 million principal amount of 6-3/4% convertible subordinated debentures due in the year 2002, and $280 million principal amount, including over-allotment options, of 10-3/4% senior subordinated notes due in 1995. Also on that date, the plaintiffs bought 2,700 of the available 31,050,000 shares of Fruit of the Loom Class A Common Stock at $9.00 per share. Plaintiffs allege that they were induced by the Registration Statement and Prospectuses, which contained false statements or omitted to state material facts, to purchase their

---

1. Frank Tracy was also a named plaintiff when this suit was initiated but has since dropped out.

2. This summary vastly understates the amount of paper submitted by all parties in this matter. Countless memoranda were filed by the plaintiffs and multiple defendants including, but not limited to, supplemental memoranda, memoranda of additional authority from various circuits, and appendix after appendix after appendix to the various memoranda. In sum, the volume of paper submitted on this motion to dismiss was staggering.

shares, and filed this nine-count Complaint against the various defendants.

In the various motions to dismiss, each defendant argued that the plaintiffs' Complaint failed to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The defendants also moved to dismiss Counts I, II, IV, V and VII for failure to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. The Magistrate Judge entered his R & R recommending that this court dismiss all counts of the Complaint for failure to state a claim for which relief can be granted and, alternatively, to dismiss Counts I, II, IV, V and VII for failure to comply with the requirements of Federal Rule of Civil Procedure 9(b).

Plaintiffs then timely filed their Objections to the R & R. Plaintiffs subsequently filed their Amended Objections to the R & R. The defendants then, collectively, filed their Memorandum in Opposition to plaintiffs' Amended Objections. Finally, plaintiffs filed their Reply Memorandum in Opposition to Magistrate Judge Rosemond's R & R. These objections and the opposition to these objections are currently before the court. The court will discuss each count in turn.

### III. *Discussion*

Before discussing each specific count, however, a brief synopsis of the legal standard applicable to this case is in order. A motion to dismiss will only be granted where it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Rothner v. City of Chicago*, 929 F.2d 297, 302 (7th Cir.1991). An analysis of the facts is limited to the language of the complaint. The court may not consider opposing briefs which would alter the facts as alleged in the complaint. *See Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir.1987). The facts alleged in the complaint must be taken as true for purposes of the motion to dismiss. In addition, all such allegations must be viewed in a light most favorable to the plaintiffs. *Gomez*, 811 F.2d at 1039.

Furthermore, in this case, the court must also be cognizant of the standard to apply to the recommendation made by the Magistrate Judge in the R & R. Pursuant to 28 U.S.C. § 636(b)(1), this court must make a "*de novo* determination of those portions of the report ... or recommendations to which objection is made." Therefore, this court will review plaintiffs' objections and make *de novo* determinations as to each. Each count and all relevant objections will be discussed in turn.

### A. Count One—Section 10(b) and Rule 10b–5

In this count, the plaintiffs allege that all the defendants "acted in violation of § 10(b) ... and Rule 10b–5 ... by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and/or omitting to state material facts ...; and (c) engaging in transactions, practices, or courses of business which operated as fraud or deceit upon plaintiffs." Complaint, at p. 22–23, ¶ 42. In his R & R, the Magistrate Judge compared the wording of the Registration Statement and Prospectus regarding each specific instance of an alleged violation to the relevant paragraph in the Complaint. We will do the same as to each objection of the plaintiffs.

#### 1. *Tax Obligations*

In paragraph 32 of their Complaint, plaintiffs stated that defendants violated § 10(b) by not stating the full tax obligation of Fruit of the Loom, as follows:

32. (a) Although at the time Fruit of the Loom filed and issued the Registration Statement, Prospectuses and Form 10–K defendants knew that Fruit of the Loom would be required to pay the Internal Revenue Service ("IRS") well over $100 million in tax deficiencies and that the Company would have to borrow funds to meet this tax obligation, defendants omitted to disclose adequately to the public this obligation, or the material

impact of the payment of this obligation on the Company's financial condition.

(b) In the notes, accompanying Fruit of the Loom's financial statements, defendants stated that the Company had adequately provided for any additional tax deficiencies and interest. Defendants omitted to disclose that:

(i) the Company expected to pay more than $100 million to the IRS and would be required to borrow funds to pay this tax obligation; and

(ii) payment of this tax obligation and the debt obligation that would be incurred to pay these taxes would have a materially adverse effect on the Company's financial condition and statements.

Complaint, at p. 15–16, ¶ 32.

*PROSPECTUS—Income Taxes:*

The Company has filed two petitions with the United States Tax Court contesting statutory notices of deficiencies. The first involves approximately $60,000,000 of alleged deficiencies covering the years 1970 through 1975, and the second approximately $45,000,000 for the years 1976 and 1977. In addition, the IRS has recently assessed the Company approximately $93,000,000 for alleged deficiencies covering the years 1978 through 1980. The IRS is currently examining the Company's tax returns for the years 1981 through 1983. The Company believes that its ultimate deficiency, before interest, will be substantially less than the amounts asserted and that it has adequately provided for any additional taxes and interest.

*Income Taxes, Notes To Consolidated Financial Statements (Prospectus)*, at F–17, Exhibit A to the Complaint.

As to this allegation, the R & R states that the claim is "either contradicted or unsupported by the Prospectus, and, thus, ... immaterial as a matter of law." R & R, at p. 10. In response, the plaintiffs state that the "Magistrate misconstrued plaintiff's allegations." Plaintiff's Amended Objections, at p. 10 (hereinafter "Objections"). Basically, the plaintiffs argue that the Magistrate Judge erred by merely add-

ing the amounts of potential tax liability disclosed in the Prospectus (to wit, $60, $45, and $93 million). Plaintiffs argue this was incorrect because "the $93 million was totally unrelated to plaintiffs' allegations.... [Rather], the Prospectus was misleading because it expressly stated that the $105 million claimed for 1970 through 1977 was not expected to be assessed against the Company." Objections, at p. 6. The court has disregarded this argument. The relevant allegations of the Complaint, reproduced above, make no distinction as to the different years of tax liability. The Magistrate Judge correctly read the allegations exactly as stated in the Complaint. Plaintiffs' attempt to reconfigure their allegation in their memoranda accompanying this motion is improper, as stated above. *See Gomez*, 811 F.2d at 1039. However, our discussion of this claim cannot end there. Plaintiffs further alleged "that defendants knew that their [tax] liability would be of this magnitude, and knew their interest [liability] would be of this magnitude, and deliberately misled the public as to its size." Objections, at p. 10; Complaint, at p. 15–16, ¶ 32. As to this claim, the court is persuaded, at this point, by the plaintiffs.

In his R & R, the Magistrate Judge found that the Prospectus contradicted this allegation because it disclosed potential tax liability of "more than $100 million." This is true. However, the Prospectus also states that "[t]he Company believes that its ultimate deficiency, before interest, will be substantially less than the amounts asserted ...". In fact, this turned out to be true, too, but the interest assessed turned out to be approximately $81 million—nearly double the tax ultimately due. A close reading of the Complaint alleges that the defendants knew that their liability, including interest, would be over $100 million. So, while the relevant statements in the Prospectus in this regard are technically true, the plaintiffs may be able to prove facts in support of their claim which would entitle them to relief. If the plaintiffs can show that the defendants knew that the interest due the IRS would be such a significant

amount, and intentionally failed to disclose this information, the court believes that plaintiffs may be able to succeed on a § 10(b) claim. Whether or not they are ultimately able to prove this is not a matter for the court to decide on a motion to dismiss. What matters is that it is possible, based only on the pleadings thus far. Therefore, the plaintiffs' objection to this portion of Count One is sustained.

Plaintiffs argue, next, in regards to the same section of the Prospectus, that that section also violates § 10(b) and Rule 10b–5 because it states that "[t]he Company ... has adequately provided for any additional taxes and interest," when in fact the Company knew that it would have to borrow substantial sums of money to pay any tax liabilities. The Magistrate Judge held that this statement could not be a violation of § 10(b) because "[t]o the reasonable investor one obvious and adequate means of providing for payment of such a large sum of money is to borrow. Moreover, the Prospectus specifically states that a source of funds will be obtained from bank loans." R & R, at p. 9. This is not dispositive. The question, now, is not what a reasonable investor might think, but whether, taking all allegations as true and in a light most favorable to the plaintiffs, the plaintiffs can prove any set of facts showing a § 10(b) violation. To succeed on a motion to dismiss, the defendants must show, as a matter of law, that no reasonable investor would consider the statement or omission misleading. The defendants have not met that burden here. On the contrary, the court believes that based on these pleadings, the plaintiffs may be able to prove such a claim.

The defendants respond to plaintiffs' objections stating that the Magistrate Judge's conclusion was correct because "the Prospectus disclosed that the Company was highly leveraged, that the Company has historically borrowed money and had substantial debt, and the Prospectus nowhere suggested that the Company would not continue, as it had in the past, to borrow funds if necessary...." Def. Memo. in Opp., at p. 8. This misses the point. In essence, the alleged misstatement is the claim in the Prospectus that the Company had "adequately provided for" its tax liabilities. The fact that the Company "had historically borrowed" does not complete the purported "half truth" of the claim in the Prospectus. It may be important to the reasonable investor to know whether or not Fruit of the Loom intended to borrow over $100 million to pay its tax liabilities. As it currently stands, there is nothing in the Prospectus to indicate that Fruit of the Loom would need to borrow funds to cover this liability. One reasonable assumption that can be made after reading that the Company "adequately provided for any additional taxes and interest" is that existing funds had already been allocated. When dealing with a debt in excess of $100 million, it is material whether or not additional borrowing is necessary to pay it off. In any case, at this point in the litigation, the court cannot say that no reasonable investor would consider this information important. As such, the court will not dismiss this portion of plaintiffs' Complaint.

Finally, regarding this element of Count One, the defendants rely on the fact that the Prospectus emphasized that any potential liability was pre-interest and that, thus, there was nothing misleading about it. This is not dispositive. The Prospectus stated that the Company believed that its ultimate tax liability, before interest, would be substantially less than the $105 million sought by the IRS. It follows, then, that if the Company knew that its tax liability would be substantially less than that assessed, it may have had some idea that interest still could be substantial. In the instant case, the interest alone turned out to exceed $80 million dollars—a significant amount. This statement, then, could be construed to be a half-truth which could be shown to be a § 10(b) violation. Therefore, the court will not dismiss this portion of the claim.

## 2.  *Environmental Liabilities*

■ In this element of Count One, plaintiffs claim that "defendants omitted to disclose adequately the Company's contingent liabilities arising from the business and op-

erations of its former subsidiary, Velsicol Chemical." Complaint, at p. 16, ¶ 33(a). Specifically, the plaintiffs claim that the Prospectus failed to disclose environmental liabilities Fruit of the Loom retained from Velsicol. The relevant disclosures are as follows.

*PROSPECTUS—Contingent Liabilities:*

The Company and its subsidiaries are involved in certain legal actions and claims on a variety of matters, including environmental matters relating to discontinued operations. The Company also remains contingently liable for $118,200,-000 of certain obligations of former subsidiaries of the Company. The obligations of the former subsidiaries relate primarily to future minimum lease payments under operating leases and do not consider the value of the underlying leased property. It is the opinion of management that such actions and claims will not have a material effect on the business or financial condition of the Company.

*Contingent Liabilities, Notes To Consolidated Financial Statements (Prospectus),* at F–12 and F–13, Exhibit A to Complaint.

*Discontinued Operations:*

During 1986, the Company sold Velsicol in a series of transactions for approximately $240,000,000 in cash, net of expenses.... No significant gain or loss resulted, or is contemplated to result, to either Northwest [Northwest Industries, Inc.] or the Company from these sales.

\*     \*     \*     \*     \*     \*

Because ... of the sale[ ] of ... Velsicol [and other companies] the financial information for these operations is presented as discontinued operations in these financial statements.

*Discontinued Operations, Notes To Consolidated Financial Statements (Prospectus),* at F–18, Exhibit A to Complaint.

*Miscellaneous*

*Litigation and Contingencies.* The Company and its subsidiaries are parties to certain legal proceedings and have retained certain liabilities with respect to the sale of certain discontinued operations, including "Superfund" and other environmental liabilities. The Company believes that these matters will not have a material effect on its business or financial condition.

*Prospectus,* at 19, Exhibit A to the Complaint. Magistrate Judge Rosemond found, based on these disclosures in the Prospectus and three newspaper accounts, that the "news-informed public knew exactly what the Prospectuses were referring to." R & R, at p. 13. Plaintiffs objected, saying the Magistrate Judge made incorrect factual findings. In essence, plaintiffs argue that the Magistrate Judge incorrectly assumed that an ordinary investor would know, after reading the Prospectus, that Fruit of the Loom retained Velsicol's enormous environmental liabilities. In response, defendants argue that the Prospectus does reveal this information if "[c]ollectively read, rather than in isolation as the plaintiffs attempt to do." Def. Mem. in Opp., at p. 10.

We disagree. It could be determined that Fruit of the Loom never adequately disclosed the magnitude of Velsicol's environmental liabilities and that this omission was material. The Magistrate Judge determined that the combination of the use of the word "Superfund" and a 1986 New York Times article on the topic should have provided an ordinary investor with the insight as to the magnitude of Velsicol's environmental liabilities. This may eventually be found to be true as a matter of law. When viewing the allegations in a light most favorable to the plaintiffs, however, the court finds that they have alleged sufficient facts such that a jury could find that the information was, indeed, omitted and would be material to a reasonable investor.

As the plaintiffs point out, and the defendants do not dispute, Fruit of the Loom may have to pay a substantial amount for Velsicol's environmental liabilities. The Superfund reference in the Prospectus does not automatically notify the reasonable investor that the Company may be liable for such a significant amount. The three newspaper accounts cited by the

underwriter defendants in their Memorandum in Opposition to the Plaintiffs' Motion to Dismiss, a New York Times article, a Los Angeles Times article and a Crain's Chicago Business article, indicate that liability could exceed $60 million. However, we do not believe that these three isolated newspaper accounts transform this into an immaterial omission. "Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public." *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir.1989). Therefore, even more widely disseminated articles would probably not render this omission immaterial. Secondly, even if public availability could render the omissions immaterial, "in order to avoid Rule 10b–5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Apple Computer*, 886 F.2d at 1116. We do not believe that these three individual newspaper accounts were disseminated to the public with the sufficient degree of intensity to render this omission immaterial. We, at least, will not make that determination here on a motion to dismiss. It seems to this court that plaintiffs may be able to show that a reasonable investor would consider it important to his investment decision that the Company was liable for over $60 million, as opposed to just retaining "Superfund liabilities". Thus, this court cannot say, as a matter of law, that plaintiffs cannot show that this is a material omission. Therefore, the court will not dismiss this portion of Count I.

### 3. *Gross and Operating Margins*

■ This portion of plaintiffs' § 10(b) claim alleges that:

> Defendants failed to disclose that the Company's gross and operating margins in 1986 were at peak levels and that these margins in 1987 were not, and would not in the future remain, at the 1986 level and in fact had dropped precipitously and have remained at a lower level so as to have a material, adverse impact on the Company's profitability. For example, gross margins for the nine month period ended September 30, 1987 were 34% as compared to gross margins of 37% for the same period of time in 1986, and gross margins for the first three months of 1987 were 33% as compared to gross margins of 36% for the same period in 1986.

Complaint, at p. 17, ¶ 34(c). This claim is based on the portion of the Prospectuses which stated that "gross margins steadily improved over the five year period, from 29.3% in 1982 to 38.6% in 1986." Prospectus, at p. 72. In fact, the Prospectus included a chart showing gross and operating margins for each year from 1982 through 1986. The plaintiffs do not argue that these figures, alone, are untrue or misleading. Plaintiffs argue that the information, overall, is misleading because it omitted to state that the "margins in 1986 were at peak levels and that these margins in 1987 were not, and would not in the future remain, at the 1986 level". The Magistrate Judge recommended dismissing this portion of Count One because "there is no duty upon management or directors to disclose financial projections." R & R at p. 16 (citing *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir.1981)). We agree.

Plaintiffs object to this recommendation, stating that defendants knew that margins were decreasing and that "once a statement has been made, there is a duty to update and correct that statement when its basis changes or no longer exists." Objections, at p. 17 (citing *Ross v. A.H. Robins Co.*, 465 F.Supp. 904, 908 (S.D.N.Y.), *rev'd on other grounds*, 607 F.2d 545 (2d Cir. 1979); *Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 346–47 (E.D.Pa.1979)). Defendants counter by arguing that the Prospectus was issued two months into 1987 and, therefore, could not have disclosed 1987 margins except by prediction, which is not required or favored by the SEC. *See Panter*, 646 F.2d at 292; *Freeman v. Decio*, 584 F.2d 186, 200 (7th Cir.1978). The court agrees with the defendants, overrules

plaintiffs' objections and adopts the reasoning of the Magistrate Judge and dismisses this portion of Count One.

### 4. *Underwear Price Reduction*

■ In paragraph 34(d) of the Complaint, the plaintiffs state that defendants violated § 10(b) by omitting "to state that the company had recently reduced the price of its men's and boy's underwear by 4% to meet competition." The relevant portions of the Prospectus stated as follows:

*Fruit of the Loom*

Fruit of the Loom is the largest producer of men's and boys' underwear, women's and girls' underwear and screen print shirts in the United States ...

Management considers Fruit of the Loom's primary strengths to be its excellent brand recognition, low cost production and strong relationships with mass merchandisers and discount chains. These strengths have enabled the Company to increase its share in the men's and boys' underwear market from 18% in 1974 to approximately 37% in 1986. In the men's and boys' underwear market, Fruit of the Loom is nearly twice as large in terms of unit sales as its nearest competitor.

### PROSPECTUS SUMMARY

*Men's and Boys' Underwear.* Fruit of the Loom holds a dominant position in the men's and boys' underwear market.

    \*     \*     \*     \*     \*     \*

In 1986, the Company supplied approximately 60% of the men's and boys' underwear sold by the discount and mass merchandiser channel.

Sales of men's and boys' basic underwear have remained consistently strong from 1982 to 1986.

*Prospectus Summary*, at 4–5. The Magistrate Judge found that this alleged omission was immaterial as a matter of law. We agree with the conclusion and with the reasoning.

Plaintiffs object, saying "[g]iven the size of Fruit of the Loom's market, a 4½% reduction [in price] meant $21 million in lost revenue." Objections, at p. 16. Plaintiffs do not argue, however, that defendants knew that the price decrease would lead to a revenue decrease, nor do they allege that it actually led to a decrease in revenue. Furthermore, a price reduction does not automatically lead to a revenue reduction. If the decreased price stimulates sufficient demand, increased revenues could actually result. In any event, the court finds that as to this paragraph of the Complaint, plaintiffs could prove no set of facts which would entitle them to relief. We do not believe that, given the total mix of information available, there is any likelihood that a reasonable investor would consider the price reduction important to his or her investment decision. As such, plaintiffs' objections are overruled and this portion of Count One is dismissed.

### 5. *Market Share*

■ Here, plaintiffs allege that defendants omitted to state that the Company's market share of the men's and boys' underwear market had decreased approximately 3% from 1985 to 1986, while "creating the false impression that market share had steadily increased since 1974." Complaint, at p. 18, ¶ 34(e). The relevant portions of the Prospectus state:

*PROSPECTUS SUMMARY—Fruit of the Loom*

Fruit of the Loom is the largest producer of men's and boys' underwear ... in the United States.

    \*     \*     \*     \*     \*     \*

Management considers Fruit of the Loom's primary strengths to be its excellent brand recognition, low cost production and strong relationships with mass merchandisers and discount chains. These strengths have enabled the Company to increase its share in the men's and boys' underwear market from 18% in 1974 to approximately 37% in 1986. In the men's and boys' underwear market, Fruit of the Loom is nearly twice as large in terms of unit sales as its nearest competitor.

    \*     \*     \*     \*     \*     \*

In 1986 ... sales increased $118.8 million (20.7%) to $692.9 million. Sales of products other than men's and boys' basic underwear—men's and boys' fashion underwear, screen print shirts, women's and girls' underwear and family socks— grew 68.8% to $297.7 million, and accounted for 43.0% of total sales.

*Men's and Boys' Underwear.* Fruit of the Loom holds a dominant position in the men's and boys' underwear market.

\* \* \* \* \* \*

In 1986, the Company supplied approximately 60% of the men's and boys' underwear sold by the discount and mass merchandiser channel.

\* \* \* \* \* \*

Sales of men's and boys' basic underwear have remained consistently strong from 1982 to 1986. Sales of other products—screen print shirts, sweatshirts, fashion underwear, women's and girls' underwear and family socks—have grown at a compound annual growth rate of 28.5% during this period, accounting for 43.0% of total Company sales in 1986. During the 1982 through 1986 period, operating earnings before goodwill amortization have grown at a compound annual rate of 32.0%.

*Prospectus Summary*, at 4–5. It is true that market share generally did increase between 1974 and 1986. The question here is whether the Prospectus had to further disclose that between 1985 and 1986 market share of men's and boys' underwear decreased approximately 3% even though it did disclose that net sales, and the percentage of sales, of men's and boys' underwear decreased between 1985 and 1986. We hold that it did not.

While market share may fluctuate, revenues and profits may or may not follow. Assuming, *arguendo*, that one could reasonably draw the inference from the Prospectus that market share was still increasing, between actual sales figures and market share we believe that sales figures are more immediately indicative and probative of the financial well-being of a product line than market share. As such, where, as here, an investor is informed that sales of a single product line are slipping, we think that it is immaterial, as a matter of law, that he or she is not told that market share of that product line has declined as well. Therefore, to argue that the defendants failed to state that market share had dipped one year, when they clearly demonstrated that sales had slumped, is not persuasive. This bit of information would not have been significant to a reasonable investor when making his or her investment decision given the total mix of information available.

This determination is further supported by the fact that only two statements in the Prospectus can, in the court's view, be said to arguably lead to the conclusion that the Prospectus led investors to believe that market share had steadily increased since 1974. The first is the statement that certain "strengths have enabled the Company to increase is share in the men's and boys' underwear market from 18% in 1974 to approximately 37% in 1986." Secondly, the Prospectus states that, "[s]ales of men's and boys' basic underwear have remained consistently strong from 1982 to 1986." This first statement creates a weak inference, if any at all, that market share growth was consistent for all those years. A reasonable investor would not assume that from that first statement. The second statement is equally as attenuated. It states that sales have been consistently strong. Yet, the charts in the Prospectus very clearly show the actual sales percentages that had declined in some years, including 1985 and 1986. Therefore, this omission is not material. Thus, this allegation does not state a claim upon which relief can be granted and is dismissed.

6. *Discount and Mass Merchandise Markets*

■ In paragraph 34(f) of the Complaint, plaintiffs allege that defendants violated § 10(b) by "emphasiz[ing] that the Company supplied 60% of men's and boys' underwear sold by discount and mass merchandiser channels in the United States, but fail[ing] to disclose that in 1985 the Company's share of that market had been 73%

and was actually declining." The Magistrate Judge found that this was "utterly insignificant" because even with this drop in this market, Fruit of the Loom was still "the largest producer of men's and boys' underwear ... in the United States, and the holder of the dominant position in th[is] ... market." R & R, at p. 23. Plaintiffs object, saying "[t]he fact that it lost its market share to other smaller companies so as to provisionally remain a dominant market force is irrelevant." Objections, at p. 20. The defendants counter that given the otherwise positive financial picture, a "drop between [1985 and 1986] in the Company's share of a sub-market of a given product line was purely collateral information." Memo. in Opp., at p. 19.

But "purely collateral" to whom? To dismiss this claim, the defendants must show that in no way could plaintiffs prove that a reasonable investor would find this omitted information significant to his or her investment decision. First, we agree with plaintiffs that market dominance is not the pivotal factor. If declining market share would be significant to a reasonable investor when making his investment decision, the mere fact that the company is still dominant at a given point in time does not render the declining market share information immaterial. With a question of declining market share, the issue is *relative* dominance, not dominance *per se*. If a firm with 90% market share began losing market share at 10% per year, it could be said to "dominate" the market for four years or so until its market share dropped below 50%. If declining market share is material, the fact that the firm is still dominant in the market at a certain point in time does not change that. Therefore, the question we must decide is, given the total mix of information available here, did the Prospectus have to disclose that market share of men's and boys' underwear supplied to discount and mass merchandiser markets had declined between 1985 and 1986. We hold that it did not.

As discussed above with regard to market share of men's and boys' underwear generally, the Prospectuses disclosed that net sales of men's and boys' underwear had dropped between 1984 and 1985 from $424.7 million to $397.7 million and between 1985 and 1986 from $397.7 million to $395.2 million. Given this, is there a substantial likelihood (or any likelihood) that a reasonable investor would consider it important to his investment decision that market share of this sub-market had declined? Before answering that question, it must also be noted that the Prospectus does not state that market share had increased or even remained steady. Plaintiffs charge only that emphasizing that the Company had 60% of the share of this sub-market created the duty to further state that market share had been at 73%. In light of all these factors, we hold that the Company's failure to acknowledge a declining market share in this sub-market was immaterial as a matter of law. While a declining market share, in and of itself, may be deemed material in some instances, where, as here, the supplied information clearly discloses that net sales had steadily decreased for two years, the information regarding declining market share of a sub-market of a product line becomes immaterial. Therefore, this portion of plaintiffs' Complaint, paragraph 34(f), is stricken for failing to allege a claim upon which relief can be granted.

### 7. *Operating Capacity*

█ Plaintiffs next argue, in Paragraph 34(g) of their Complaint, that defendants violated § 10(b) because:

Defendants omitted to disclose that the Company was operating at or near 100% capacity and that it would be required to borrow substantial additional funds in the future for capital expansion, thereby delaying debt repayment and further burdening the Company's already heavily laden debt structure.

The R & R recommends dismissing this claim because (1) it should have been known to investors that the Company was at 100% capacity evidenced by the fact that they anticipated a "capacity expansion program", and (2) because "it [was] obvious ... that the Company must borrow substantial funds in the future" due to other

statements made in the Prospectus not necessarily related to capacity expansion. *See* R & R, at p. 23–24. Plaintiffs object by arguing that it was not obvious that the Company would have to borrow to increase capacity because the Prospectus stated that the Company would fund the capacity expansion operation from increased cash flow. Plaintiffs also argue that capacity expansion can be planned for many reasons, and does not necessarily indicate that the company is operating at 100% capacity. Defendants counter this objection by adopting the reasoning of the Magistrate Judge.

We believe that the plaintiffs may be able to prove a § 10(b) claim if they can show, among other things, that a reasonable investor would have found it important to his investment decision that Fruit of the Loom was operating at 100% capacity. We do not believe that, just because the Prospectus stated that the Company was undergoing capacity expansion, this tells the reasonable investor that the Company is operating at 100% capacity. Without speculating as to the exact reasons for such an expansion program, it would seem as though other reasons could, indeed, exist. Therefore, it is fair to state that the Prospectus does not, necessarily, disclose that the company was operating at 100% capacity. Furthermore, we believe that a reasonable investor may deem it important to the investment decision that the Company was operating at 100% capacity and would have to borrow substantial sums to finance capacity expansion. In any case, we will not say, as a matter of law for purposes of a motion to dismiss, that in no case could plaintiffs prove such a proposition. As such, this claim will not be dismissed.

### 8. *Farley's Business Strategy*

In paragraphs 35(a) and (b) of their Complaint, plaintiffs next argue that:

In the Prospectuses, defendants applauded Farley and his management team for their profitable strategy of promoting sales growth in related products and markets and for their success in reducing acquisition debt significantly by diverting Northwest's businesses other than Fruit of the Loom.

Defendants, however, failed to disclose that Condec Corporation, a company Farley had previously acquired in a leveraged buy-out and for which Farley and his management team had adopted a similar strategy, had experienced significant liquidity problems that required Farley Inc. to fund Condec and have resulted in Condec's default on $35.5 million in debentures and the planned wind-up and liquidation of that company.

Complaint, at p. 18–19, ¶ 35. As to this claim, the R & R states that Condec is in no way related to Fruit of the Loom and that Farley's past did not need to be disclosed. Therefore, according to the R & R, any "omission" is immaterial. Plaintiffs object by analogizing this part of the Prospectus to a proxy statement and stating that 17 C.F.R. § 240.14a–101 requires disclosure, in a proxy, of a nominee's business experience and fitness to hold office. Defendants counter by arguing that this is not a proxy contest and that they were not required to list every director's and officer's successes and failures.

Both parties are on target but miss the bullseye. In this case, there is no rule requiring disclosure of the business histories of specific people. To state a claim under § 10(b), a plaintiff must show that the defendant made an untrue statement of material fact or omitted to state a material fact which omission made the disclosed information misleading. So, on the one hand, we agree with the defendants that a Prospectus need not always disclose the business histories of every officer and director. On the other hand, we agree with the gist of plaintiffs' argument that if the business history of a director is material and would affect a reasonable investor's investment decision, it must be disclosed to avoid potential § 10(b) liability. The question is, thus, whether the person's history is material to the particular situation.

As alleged, we believe that plaintiffs could prove no set of facts under this claim which would entitle them to relief. The heart of this claim, as alleged, is merely

that "Farley and his management team had adopted a similar strategy" that failed previously. As stated in the R & R, "[p]laintiffs do not allege that Condec and Fruit of the Loom are in any way similar companies, or that the circumstances surrounding Farley's leveraged buy-out of Condec were similar to Fruit of the Loom's circumstance at the time of the Prospectus." R & R, at p. 28. The most plaintiffs allege is that at one time during an interview, Farley stated that the difference between acquiring apparently unrelated companies, one much larger than the other, "is primarily a function of adding zeroes." Objections, at p. 23 n. 10. Plaintiffs attempt to use this statement to show that Farley's handling of Condec is, thus, material to whether he will succeed or fail at handling Fruit of the Loom. We disagree and reaffirm the reasoning of the Magistrate Judge as to this point. The defendants were not required to disclose, in the Prospectus, information regarding Farley's handling of Condec Corporation. Plaintiffs' objections are overruled and this portion of Count One is dismissed.

### Conclusion as to Count I

For the reasons stated above, the court orders that paragraphs 34(c), (d), (e), (f) and 35(a) and (b) of the Complaint be stricken for failing to state a claim upon which relief can be granted.

### B.  Count II—§ 11 of the 1933 Act

In Count Two, plaintiffs allege that each defendant is liable under § 11 of the 1933 Act, 15 U.S.C. § 77k, for participating in the issuance of the Prospectuses which contained "untrue statements of material fact required to be stated therein or omitt[ed] to state material facts necessary in order to make the statements made therein not misleading." Complaint, at p. 25, ¶ 48(b). In support of this claim, plaintiffs allege the same untrue or omitted statements as those alleged to be in violation of § 10(b) in Count One. As such, the Magistrate Judge found that because none of the Count One allegations were sufficient to support a claim, Count Two must fail on the same grounds. Based on the above findings

with respect to Count One, we sustain the plaintiffs' objections with respect to this claim insofar as we held that the allegations were material in Count One. Therefore, this court will dismiss that portion of Count Two based on paragraphs 34(c), (d), (e), (f) and 35(a) and (b) of plaintiffs' Complaint and not dismiss the remaining allegations of Count Two.

The other reason the Magistrate Judge gave for dismissing Count Two is for failing to comply with Fed.R.Civ.P. 9(b). Because the defendants make a Rule 9(b) challenge to Counts I, II, IV, V, and VII which the Magistrate Judge accepted, we will discuss all Rule 9(b) arguments below in relation to each of these Counts.

### C.  Count III—§ 12(2) of the 1933 Act

The Magistrate Judge first recommended that this count be dismissed for failing to allege material misstatements or omissions as determined in relation to Count One. For the same reasons as stated above with regard to these allegations, paragraphs 34(c), (d), (e), (f) and 35(a) and (b) are stricken. As to the remaining allegations, we must determine if the Complaint has sufficiently pleaded a § 12(2) claim.

To state a claim under § 12(2) of the 1933 Act (15 U.S.C. § 77*l*(2)), the defendants must, at the very least, be "sellers" of securities. The Magistrate Judge found, first, that the accounting firm defendants are not sellers and the plaintiffs conceded as much. Therefore, to the extent Count Three attempts to assert a claim against the accounting firm defendants, it is dismissed. The Magistrate Judge then declined to decide whether the underwriter defendants could be liable under § 12(2) because he found the claims to be immaterial and, thus, legally insufficient. Because we found that the claims are not all legally insufficient, we must decide if these material claims against the underwriter and other identified defendants can withstand a motion to dismiss.

Plaintiffs allege that the following defendants are liable under § 12(2): (1) all the investment banking firm defendants and

Black as the agent and/or controlling person of Drexel Burnham, (2) Fruit of the Loom Officer and Director defendants Black, Cion, Meier, Farley, Albertine, Hall, and Kinney, and (3) Fruit of the Loom. The plaintiffs allege that the investment banking firm defendants and Black are directly liable as sellers under § 12(2). They further allege that the remaining named defendants are liable for playing a "substantial part in the sale of the securities". Complaint, at ¶¶ 50–53. Each will be discussed in turn.

### a. *Underwriter Defendants and Leon Black*

■ The underwriter defendants never argue that they are not liable under § 12(2) because they are not sellers. Neither in their original memoranda nor their opposition to plaintiffs' objections do they make this argument. Furthermore, underwriters can be sellers within the meaning of § 12(2), as acknowledged by the Magistrate Judge in the R & R and not objected to by the parties. Therefore, this count will not be dismissed as to these defendants.

### b. *Fruit of the Loom and its Officer and Director Defendants*

■ The R & R never addressed these defendants specifically under this claim because it concluded the claim was insufficient as a matter of law. According to the Complaint, these defendants are liable under § 12(2) because they "played a substantial part in the sale of the securities". Complaint, at p. 27 ¶ 52(c). The question of whether a "substantial participant" can be liable under § 12(2) seems to be an open question in this circuit.

Generally, no strict privity between the plaintiff-purchaser and defendant-seller is required to prove liability under § 12(2). *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 939 (7th Cir.1989); *Craig v. First American Capital Resources, Inc.*, 740 F.Supp. 530, 533–34 (N.D.Ill.1990). However, this Circuit has thus far not embraced any one test to determine what constitutes an offeror or seller under § 12(2) of the 1933 Act. *See Craig*, 740 F.Supp. at 534;

*Schlifke*, 866 F.2d at 940 (recognizing the *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the "substantial factor" and the "proximate cause" tests). We need not delve deeply into the various tests here, however, because the plaintiffs have not alleged facts which would qualify these defendants as offerors or sellers under any of the tests.

Here, plaintiffs allege only that these defendants are liable because "they played a substantial part in the sale of the securities" by assisting or participating in the preparation of the Registration Statement and Prospectus, and the Company itself as the issuer. These allegations fall far short of showing that these defendants were sellers or offerors of these securities. Plaintiffs do not allege any contact between themselves and these defendants or any meaningful participation or solicitation by these defendants in the sale. *See In re Worlds of Wonder Sec. Litig.*, 694 F.Supp. 1427, 1434–35 (N.D.Cal.1988); *Miller v. New America High Income Fund*, 755 F.Supp. 1099, 1105 (D.Mass.1991). As such, these defendants cannot be liable under § 12(2) as a matter of law. Furthermore, Fruit of the Loom, as the issuer, cannot be liable as a seller because plaintiffs alleged that they bought the securities from an investment banker defendant and do not allege any special relationship with, contact with or solicitation by Fruit of the Loom. *See In re Wicat Sec. Litig.*, 600 F.Supp. 1236, 1242 (D.C.Utah 1984). Therefore, Count Three is dismissed as to Fruit of the Loom and its Officer and Director defendants.

### D. Count IV—Common Law Fraud

The Magistrate Judge recommended dismissing this count because of his prior finding that the Complaint was legally insufficient. To the extent this court disagreed with that finding, plaintiff's claim of common law fraud will not be dismissed. The only other ground on which the Magistrate Judge recommended dismissing this Count is for failing to comply with Rule 9(b). This will be discussed below.

### E. Count V—The Illinois Consumer Fraud Act

■ Magistrate Judge Rosemond recommended dismissing this claim because he found the plaintiffs' allegations immaterial as a matter of law, for not complying with FED.R.CIV.P. 9(b), because it was only a pendent state claim and should be dismissed with the federal claims, and because the Illinois Consumer Fraud Act does not apply to securities transactions. As to the first rationale, we have already held that plaintiffs have alleged facts which could entitle them to relief. Therefore, those allegations that have been sustained must be considered here. Furthermore, because plaintiffs have alleged actionable federal claims, allowing this state claim would be a valid exercise of pendent jurisdiction. The only remaining rationales for dismissing this claim are for failing to comply with Rule 9(b) and because the Illinois Consumer Fraud Act does not apply to securities violations. The Rule 9(b) challenge will be discussed below and the Illinois Consumer Fraud Act challenge requires minimal discussion.

The Illinois Consumer Fraud and Deceptive Business Practices Act has been held by this court numerous times to apply to securities violations. *See Lyne v. Arthur Andersen & Co.*, 772 F.Supp. 1064 (N.D.Ill. 1991); *Wislow v. Wong*, 713 F.Supp. 1103, 1107 (N.D.Ill.1989) ("the majority of judges in this district ... have held ... that the Act does apply to conduct additionally regulated by federal and state securities laws."). Therefore, this count will not be dismissed on that ground. The only remaining ground for dismissing this count is that it fails to comply with FED.R.CIV.P. 9(b). This argument will be addressed below.

### F. Count VI—Negligence

■ Again, the Magistrate Judge recommended dismissing this claim because he found all the allegations legally insufficient. To the extent we disagreed with that conclusion, this claim will not be dismissed on this ground. He also recommended dismissing this count because Illi-nois does not recognize this cause of action against these defendants. Plaintiffs dispute this conclusion only as to the accounting firm defendants. Therefore, this claim is dismissed as to all defendants other than the accounting firm defendants.

As to the accountants, plaintiffs argue that this count states a claim for negligent misrepresentation because they were in the business of providing information for the guidance of others in their business with third parties, which is required for a claim of negligent misrepresentation. Defendants respond that, even if they fall within that definition, they cannot be liable because they owed no duty to these plaintiffs under the relevant Illinois statute, the Illinois Public Accounting Act. ILL.REV.STAT. CH. 111, § 5501 *et seq.* We agree. Section 30.1(2) of that statute provides that an accountant cannot be held liable for civil damages for such acts as alleged here unless the accountant or accounting firm:

> was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action; provided, however, ... if such ... partnership ... (i) identifies in writing to the client those persons who are intended to rely on the services, and (ii) sends a copy of such writing ... to those persons identified in the writing....

ILL.REV.STAT. CH. 111, § 5535.1(2). No such allegations of privity, intentional wrongdoing or written notification were made here. "Without allegations of privity between [the] plaintiffs and [the accounting firm defendants], fraud or intentional misrepresentation by [the defendants], or written notification by [these defendants] identifying non-privity parties intended to rely on [the accountants'] report, § 30.1 of the Illinois Public Accounting Act bars plaintiffs' tort action" against these defendants. *Robin v. Falbo*, 1992 WL 188429, 1992 U.S.Dist. LEXIS 11075, No. 91 C 2894 (N.D.Ill. July 24, 1992) (order dismissing plaintiffs' claims of negligent misrepresentation against an accounting firm); *see also* Michael J. Polelle, *Accountants' Privity Shield: An Illinois Mistake?*, 38 DePaul L.Rev. 685, 685–89 (1989) (recognizing the

great lengths to which the accountant must go before liability for negligent misrepresentation may attach). Therefore, Count VI is dismissed with prejudice.

### G. Count VII—Illinois Blue Sky Act Fraud

■ First, to the extent this court determined that plaintiffs' allegations are material and state a claim, the plaintiffs' objections to the R & R are sustained. The Magistrate Judge further found, however, that this count is legally insufficient because it fails to comply with FED.R.CIV.P. 9(b), because the Illinois Blue Sky law allows only a rescission remedy while plaintiffs seek damages, because plaintiffs have not complied with the written notice requirements of the Illinois law and, finally, because it is a state law claim and this court does not have pendent jurisdiction when the federal claims are all dismissed. Only one of these reasons will be discussed here.

This count will be dismissed for failure to comply with the actual notice requirements of Section 137.13(B) of the Illinois statute. To maintain an action under that section,

> [n]otice ... shall be given by the purchaser within six months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable ... by registered mail or certified mail ... addressed to the person to be notified ... or by personal service.

ILL.REV.STAT. CH. 121½, para. 137.13(B) (Smith–Hurd 1992). Plaintiffs do not deny that they did not attempt to give the defendants the requisite notice under this section. Instead, plaintiffs argue that this lawsuit provided the requisite notice, citing *Norville v. Alton Bigtop Restaurant, Inc.*, 22 Ill.App.3d 273, 284, 317 N.E.2d 384, 391 (5th Dist.1974). We disagree.

This statute is very specific in what qualifies as sufficient notice. In the case cited by plaintiffs, the court states that "a complaint with sufficiently specific allegations" may be a valid substitute for the statutory notice. *Norville*, 317 N.E.2d at 391. In that case, the plaintiffs "specifically stated in their complaint that by filing suit they elected to void the sale ... and that less

than six months had elapsed between the time they acquired knowledge that the sales were voidable and the time of filing suit". *Norville*, 317 N.E.2d at 391. Here, plaintiffs do not state in their Complaint that they wish to void the sale, or that less than six months had elapsed since they acquired knowledge that the sale was voidable. Therefore, the Complaint here is not a substitute for the requisite statutory notice. As such, this count is dismissed with prejudice.

### H. Count VIII—§ 17(a) of the 1933 Act

Besides finding that plaintiffs' allegations fail to state actionable claims, the Magistrate Judge also recommended dismissing this claim because no private right of action exists under § 17(a) of the 1933 Act. R & R, at 41. Plaintiffs do not object to this finding. Therefore, this count is dismissed with prejudice.

### I. Count IX—Breach of Fiduciary Duty

■ To the extent we find that plaintiffs have stated material misrepresentations or omissions, this count will not be dismissed for legally insufficient allegations. The Magistrate Judge also recommended dismissing this count because plaintiffs failed to allege that they are currently stockholders or that they were at any time relevant to these allegations, and because the allegations that the directors operated "the corporation for their own personal gain" fails to state a claim. We agree with the Magistrate Judge.

The plaintiffs object by arguing that this is a direct, not derivative, action and so they need not be current stockholders to maintain the action, and that, as one-time shareholders, the defendants owed them fiduciary duties which they breached. The plaintiffs cite no authority for their first proposition but we will assume, *arguendo*, it is a correct statement. This count nevertheless cannot be maintained because the plaintiffs fail to sufficiently allege a breach of any fiduciary duty owed them. Plaintiffs' claim rests on allegations that the defendants

(a) conduct[ed] the business ... for their own personal gain; and

(b) fail[ed] to disclose to plaintiffs ... the true financial condition of Fruit of the Loom....

The first allegation is insufficient as a matter of law because there are simply no factual allegations whatsoever to support such a charge. The second paragraph above is legally insufficient because plaintiffs make no allegations that any duty was breached after they became shareholders. The allegations in the Complaint state that any misrepresentations or omissions came before plaintiffs became shareholders and, thus, before defendants owed them a fiduciary duty. Therefore, Count Nine fails to state a claim upon which relief can be granted and is dismissed.

J. Rule 9(b) Requirements

As well as recommending dismissal for failure to allege material omissions or untrue statements, Magistrate Judge Rosemond also found that the allegations of Counts One, Two, Four, Five and Seven failed to meet the particularity requirements of FED.R.CIV.P. 9(b). He stated that the "fraud counts set forth the time, place, particular contents of the false representations and the consequences of the misrepresentations. However, the Complaint does not set forth with particularity *the identity of the party making the misrepresentations.*" R & R, at p. 30. While we agree in part and disagree in part with the reasoning, we do not accept the conclusions of the R & R.

■ The purpose of Rule 9(b) is to apprise the party alleged to have committed fraud of the charges against him or her and to permit an adequate response. *See Towers Financial Corp. v. Solomon,* 126 F.R.D. 531, 535 (N.D.Ill.1989); *Elliott Graphics, Inc. v. Stein,* 660 F.Supp. 378, 380 (N.D.Ill.1987); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979). The allegations in the Complaint meet this requirement.

■ The Complaint does not impermissibly "lump" the defendants together.

Plaintiffs need not allege facts which are in the exclusive knowledge or control of the defendants. *In re United Telecommunications, Inc. Sec. Litig.,* No. Civ. A. 90–2251–0, 1992 WL 176430, slip op. at *2 (D.Kan. July 6, 1992) (recognizing exception to strict Rule 9(b) pleading requirements where "a group of defendants is responsible for a document or statement containing fraudulent misrepresentations"); *In re Sahlen & Assocs., Inc. Sec. Litig.,* 773 F.Supp. 342, 362 (S.D.Fla.1991). Here, the plaintiffs have no way of knowing which defendant made which misrepresentations or omitted which material facts. It is sufficient here that, as the Magistrate Judge found, the allegations set forth the time, place, contents and consequences of any misrepresentations. The court and the defendants are fully able to adequately respond to these charges. Therefore, the fraud counts will not be dismissed for "lumping together" the defendants.

■ The Magistrate Judge found it significant, for example, that "[m]any of the allegations directed against Arthur Andersen relate to a time period during which Andersen was no longer the auditor for Fruit of the Loom." R & R, at p. 30. This is true. It is not, however, a reason to dismiss the entire Complaint. The Complaint does allege, *inter alia,* that

In addition to its participation in and approval of the above enumerated actions, defendant Arthur Andersen, Fruit of the Loom's independent auditors, certified the consolidated financial statements of Fruit of the Loom without qualification and allowed its qualifications to be incorporated in Fruit of the Loom's 10–K Report for 1986 and the Registration Statement and Prospectus Fruit of the Loom filed in connection with the 1987 public offering.

Complaint, at p. 19, ¶ 36(a). This paragraph indicates that plaintiffs have alleged specific facts against AA & Co. and other defendants. The fact that plaintiffs also allege that AA & Co. participated in other acts of other defendants when they were no longer affiliated with Fruit of the Loom is not dispositive. The time, place, contents

and consequences of the alleged fraudulent statements and omissions have been alleged. They are thus able to answer the pleadings which is what is important. If the defendants could not identify the statements made, or the time or place they were made a different result may be warranted. Here, however, the allegations of plaintiffs' Complaint meet the requirements of Rule 9(b).

## IV. *Conclusion*

Based on the foregoing, we hold that the allegations of paragraphs 34(c), (d), (e), (f) and 35(a) and (b) fail to allege material misrepresentations or omissions of material fact and, as such, order these allegations stricken from plaintiffs' Complaint. Therefore, all counts in the Complaint are dismissed to the extent the allegations relied on these paragraphs. Furthermore, Count III is dismissed as to the accounting firm defendants, Fruit of the Loom and its Officer and Director defendants (except for Leon Black as agent of Drexel Burnham). Counts VI, VII, VIII and IX are dismissed for failure to state a claim upon which relief can be granted.