**Henry T. ENDO et al., Plaintiffs,**

v.

**John M. ALBERTINE, et al., Defendants.**

### No. 88 C 1815.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 9, 1994.

Memorandum Granting Reconsideration
and Clarification Sept. 29, 1994.

---

712

Dennis A. Bell, Paul Felton Harvey, Bell & McGurk, Ltd., Terry Rose Saunders, Arthur T. Susman, P. Terrence Buehler, Susman, Saunders & Buehler, Charles J. Schneider, Charles J. Schneider & Associates, Chicago, IL, for John Lesch, Henry T. Endo and Frank Tracy.

Donald E. Egan, Bonita L. Stone, Lee Ann Watson, Katten, Muchin & Zavis, Chicago, IL, for John M. Albertine, Leon D. Black, Richard M. Cion, William F. Farley, William K. Hall, Douglas M. Finney, Robert J. Meier and Fruit of the Loom, Inc.

James Andrew Klenk, Bernard J. Nussbaum, Donna Lee Marks, Sonnenschein, Nath & Rosenthal, Chicago, IL, Joel M. Leifer, New York City, for Drexel Burnham Lambert Inc., Merrill Lynch Capital Markets, EF Hutton & Co. Inc., Shearson Lehman Hutton Inc., and Dean Witter Reynolds Inc.

Robert D. McLean, John M. George, Christopher W. Frost, Jeffrey R. Tone, Scott Charles Solberg, Sidley & Austin, Chicago IL, for Arthur Andersen & Co.

Jerold Sherwin Solovy, Joel J. Africk, Jenner & Block, Chicago, IL, Patricia A. McGovern, Carl D. Liggio, Arthur Young & Co., New York City, Gail A. Niemann, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, for Arthur Young & Co.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiffs Henry T. Endo, John Lesch and Frank Tracy, on behalf of themselves and a class of similarly situated individuals,[1] initial-

---

**1.** Of the initial three named plaintiffs, Henry T. Endo, John Lesch and Frank Tracy, only Endo remains as a plaintiff. Tracy withdrew and Lesch was found to be an inadequate class representative. The plaintiff class is defined in the complaint as follows:

All persons and entities who purchased or otherwise acquired the Class A common stock,

6¾% convertible debentures or 10¾% notes of Fruit of the Loom during the period from March 3, 1987 to and including March 1, 1988 pursuant to the 1987 public offering or at any time, during this period in the open market, but excluding defendants, members of their family, their heirs, successors and assigns, the officers, directors and affiliates and subsidiaries of any corporate defendant.

ly filed a nine-count complaint against defendants Fruit of the Loom, Inc. ("FOL"), various directors and officers of FOL including John M. Albertine, William F. Farley, William K. Hall, Richard M. Cion, Douglas M. Kinney, and Robert J. Meier (collectively referred to as "FOL defendants"), accounting firms Arthur Andersen & Co. and Ernst & Young, and investment banking firms Drexel Burnham Lambert Inc.,[2] Merrill Lynch Capital Market, Shearson Lehman Hutton Inc., and Dean Witter Reynolds, Inc. (collectively referred to as "Underwriter defendants")[3] alleging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) *et seq.* ("1934 Act"), and Rule 10b–5 promulgated thereunder (Count I); violations of §§ 11, 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("1933 Act") (Counts II, III and VIII); common law fraud (Count IV); violations of the Illinois Consumer Fraud Act (Count V); negligence (Count VI); violations of the Illinois "Blue Sky" Act (Count VII); and breach of fiduciary duty (Count IX).

In an order dated January 29, 1993, United States District Judge James H. Alesia found that the allegations contained in ¶¶ 34(c), (d), (e), (f), and 35(a) and (b) of plaintiffs' complaint failed to allege material misrepresentations or omissions of material facts, and dismissed all counts in the complaint to the extent the claims relied on these paragraphs. *See Endo v. Albertine,* 812 F.Supp. 1479, 1498 (N.D.Ill.1993) (*"Endo I"*). In addition, Judge Alesia dismissed Count III as to the accounting firm defendants and the FOL defendants and Counts VI, VII, VIII and IX as to all defendants for failure to state a claim upon which relief can be granted.

All defendants have now separately filed motions for summary judgment as to all five remaining counts of plaintiffs' complaint. Plaintiffs have also moved for partial summary judgment on Count II against defendant FOL and the Underwriter defendants. In addition, the FOL defendants have filed a

motion to strike the affidavit of Paul Grier submitted by plaintiff in opposition to defendants' motions for summary judgment. For the reasons stated below, the FOL defendants' motion for summary judgment is denied, the FOL defendants' motion to strike is denied, the Underwriter defendants' motion for summary judgment is denied, defendant Arthur Andersen's motion for summary judgment is granted, defendant Ernst & Young's motion for summary judgment is denied, and plaintiffs' motion for summary judgment is denied.

## BACKGROUND

Plaintiffs allege that, through a Registration Statement and Prospectus, the various defendants disseminated false and misleading statements and failed to disclose material facts in relation to a public offering of securities made by FOL on March 3, 1987. On March 3, 1987, FOL made a public offering consisting of 31,050,000 shares, including over-allotment options at $9.00 per share, of Class A Common Stock, $60 million principal amount of 6¾% convertible subordinated debentures due in the year 2002, and $280 million principal amount, including over-allotment options, of 10¾% senior subordinated notes due in 1995. Plaintiffs allege that in the Registration Statement and Prospectus, defendants made various material misrepresentations and omissions of fact which purportedly inflated the price of the securities issued. Plaintiffs claim that they were induced by the allegedly false statements contained in FOL's Registration Statement and Prospectus to purchase shares of FOL stock at inflated prices.

More specifically, plaintiffs' claims in Counts I through V are all based on the same set of the following allegations:

(a) The defendants failed to disclose that the Company would be required to pay over $100 million to the IRS for prior years income tax deficiencies, including failing to disclose that amount of potential

---

2. Drexel Burnham Lambert Inc., the lead underwriter, was dismissed as a defendant in this case on March 18, 1993, due to its April, 1992 bankruptcy discharge.

3. Merrill Lynch, Shearson Lehman and Dean Witter serve as representatives for a defendant class of underwriters defined as "[a]ll of the 106 underwriters of the 1987 public offering of Fruit of the Loom stock."

accumulated interest thereon and that the Company would have to borrow funds to pay the IRS;

(b) The defendants failed to disclose that the Company had retained substantial contingent environmental liabilities of its former subsidiaries and would be required to make substantial expenditures to fund these liabilities;

(c) The defendants failed to disclose that the Company was operating at or near 100% capacity and would be required to borrow substantial additional funds for capital expansion.

While not all the elements of each of the remaining claims contained in plaintiffs' complaint are identical, each claim requires proof of a misrepresentation or omission of a material fact and proof of a loss caused by the alleged misrepresentation or omission. Therefore, if the undisputed facts establish that defendants made no material misrepresentations or omissions in the Registration Statement and Prospectus or that plaintiffs suffered no loss as a result of any misrepresentation or omission, defendants would be entitled to summary judgment on the remaining five counts of plaintiffs' complaint.

### I. Tax Obligations

Plaintiffs allege that defendants violated § 10(b) of the 1934 Act by failing to fully disclose the future tax obligations of FOL.[4] More specifically, plaintiffs claim that defendants knew but failed to disclose in the Registration Statement or Prospectus that FOL would be required to pay the IRS a cash payout in excess of $100 million in tax deficiencies for the tax years 1970–77, and that FOL would have to borrow funds to meet these tax obligations.

The relevant provision of the Prospectus regarding tax obligations of FOL state as follows:

The Company has filed two petitions with the United States Tax Court contesting statutory notices of deficiencies. The first involves approximately $60,000,000 of alleged deficiencies covering the years 1970 through 1975, and the second approximate-

ly $45,000,000 for the years 1976 and 1977. In addition, the IRS has recently assessed the Company approximately $93,000,000 for alleged deficiencies covering the years 1978 through 1980. The IRS is currently examining the Company's tax returns for the years 1981 through 1983. The Company believes that its ultimate deficiency, before interest, will be substantially less than the amounts asserted and that it has adequately provided for any additional taxes and interest.

*Income Taxes, Notes To Consolidated Financial Statements* (*Prospectus*), at F–17, *Exhibits to Plaintiff Henry T. Endo's Local Rule 12(m) Statement* ("*Endo Exhibits*"), Volume I, Ex. 1.

Plaintiffs argue that the evidence clearly establishes that defendants were aware of FOL's tax obligations at the time the 1987 Registration Statement and Prospectus were issued. More specifically, plaintiffs claim that defendants' statement in the Prospectus that FOL's ultimate tax deficiency would be substantially less than the amounts asserted by the IRS was fraudulent because defendants knew in 1986 that within a year of the offering payment of approximately $120 million to the IRS for tax deficiencies was likely. In addition, plaintiffs claim that defendants' failure to list the tax deficiency on FOL's balance sheet as a current liability rather than under the heading "Noncurrent and deferred income taxes" was a material misrepresentation.

### II. Environmental Liabilities

Plaintiffs claim that defendants failed to adequately disclose FOL's contingent liabilities arising from the business and operations of its former subsidiary, Velsicol Chemical.[5] More specifically, plaintiffs allege that the Prospectus failed to disclose environmental liabilities FOL retained from Velsicol. The relevant provisions of the Prospectus regarding the contingent environmental liabilities of FOL state as follows:

The Company and its subsidiaries are parties to certain legal proceedings and

---

4. *See Complaint*, at ¶ 32.

5. *See Complaint*, at ¶ 33.

have retained certain liabilities with respect to the sale of certain discontinued operations, including "Superfund" and other environmental liabilities. The Company believes that these matters will not have a material effect on its business or financial condition.

*Contingent Liabilities, Notes To Consolidated Financial Statements (Prospectus),* at F–12 and F–13, *Endo Exhibits,* Volume I, Ex. 1.

The Company and its subsidiaries are involved in certain legal actions and claims on a variety of matters, including environmental matters relating to discontinued operations. The Company also remains contingently liable for $118,200,000 of certain obligations of former subsidiaries of the Company. The obligations of the former subsidiaries relate primarily to future minimum lease payments under operating leases and do not consider the value of the underlying leased property. It is the opinion of management that such actions and claims will not have a material effect on the business or financial conditions of the Company.

*Prospectus, Miscellaneous, Id.* at 19.

### III. *Operating Capacity*

Plaintiffs allege in ¶ 34(g) of their complaint that defendants violated § 10(b) of the 1934 Act by failing to disclose that FOL was currently operating at or near 100% capacity and would be required to borrow substantial additional funds for future capital expansion. Defendants claim that FOL fully and truthfully disclosed the details of its intended capital expansion in the Prospectus and that it was obvious that the company would need to borrow substantial funds to finance the capital expansion. In addition, defendants argue that a reasonable investor would have realized that FOL was operating at or near 100% capacity because the Prospectus stated that FOL was undergoing capacity expansion.

**6.** Plaintiffs' claims of primary violations of § 10(b) and Rule 10b–5 included in Count I,

### *ANALYSIS*

### I. *Count I—Central Bank*

██ Included in Count I is an allegation that certain defendants are secondarily liable under § 10(b) of the 1934 Act for their conduct in aiding and abetting the other defendants' fraudulent activity. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), however, the Supreme Court held that a private plaintiff may not maintain an aiding and abetting claim under § 10(b) of the 1934 Act. *Id.* at ——, 114 S.Ct. at 1455. The Court found that the statutory text of § 10(b) which makes it "unlawful for any person, directly or indirectly, … [t]o use or employ, in connection with the purchase or sale of any security …, any manipulative or deceptive device or contrivance," does not reach those who aid and abet a § 10(b) violation. *Id.* at ——, 114 S.Ct. at 1448. The Court concluded that "[i]t is inconsistent with settled methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text." *Id.*

Following the Supreme Court's decision in *Central Bank,* the parties in this case agreed that plaintiffs' claims of aiding and abetting primary violations of § 10(b) contained in Count I of the complaint should be dismissed.[6] The only remaining issue this court must resolve regarding Count I is whether the aiding and abetting claims should be dismissed with or without prejudice.

Plaintiffs argue that because Congress is currently considering legislation which would effectively overrule the *Central Bank* decision retroactively, the court should dismiss the aiding and abetting claims without prejudice to allow plaintiffs to reassert these claims if Congress enacted this legislation. Defendants argue that dismissal with prejudice is appropriate in light of the fact that they have already filed a summary judgment motion as to Count I.

██ The dismissal of a plaintiff's claim without prejudice under Federal Rule of Civil Procedure 41(a)(2) "is always within the

however, are unaffected by the Supreme Court's decision.

discretion of the trial court." [7] *Ratkovich v. Smith Kline*, 951 F.2d 155, 157 (7th Cir.1991) (citations omitted). "[A] district court may impose such terms and conditions [on the dismissal] as it believes necessary to protect the other parties from prejudice." *Id.* at 158. These terms and conditions are the "'quid pro quo* of allowing the plaintiff to dismiss his suit....'" *Brandt v. Schal Associates, Inc.*, 854 F.2d 948, 955 (7th Cir.1988) (quoting *McCall–Bey v. Franzen*, 777 F.2d 1178, 1184 (7th Cir.1985)). The Seventh Circuit has listed several factors for a district court to consider in making a determination as to whether the defendant has suffered sufficient legal prejudice to justify a dismissal with prejudice. These factors include "'the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal and the fact that a motion for summary judgment has been filed by the defendant.'" *Ratkovich*, 951 F.2d at 158 (quoting *Pace v. Southern Express Co.*, 409 F.2d 331, 334 (7th Cir.1969)).

After careful consideration of the relevant factors, the court finds that plaintiffs' aiding and abetting claims should be dismissed without prejudice. It is clear that the plaintiffs have not shown a lack of diligence in prosecuting this action. In addition, the Supreme Court's recent decision in *Central Bank* provides a more than sufficient explanation for the need to voluntarily dismiss Count I. Although the defendants triggered one of the factors listed in *Pace* when they filed their motions for summary judgment, "[t]he enumeration of the factors to be considered in *Pace* is not equivalent to a mandate that each and every factor be resolved in favor of the moving party before dismissal is appropriate. It is rather simply a guide for the trial judge, in whom the discretion ultimately rests.'" *Kovalic v. DEC Int'l,*

*Inc.*, 855 F.2d 471, 474 (7th Cir.1988) (quoting *Tyco Laboratories, Inc. v. Koppers Co., Inc.*, 627 F.2d 54, 56 (7th Cir.1980)).

The court finds that because the aiding and abetting claims contained in Count I are being dismissed through no fault of the plaintiffs, plaintiffs have not caused defendants to suffer sufficient legal prejudice to justify a dismissal with prejudice. Therefore, the court dismisses the aiding and abetting claims contained in Count I as to defendant Ernst & Young without prejudice.[8]

## II. *Defendants' Joint Motion For Summary Judgment*

### A. *Standard of Review*

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. Pro. 56(c). In ruling on a motion for summary judgment, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). There is no issue for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict

---

7. Rule 41(a)(2) provided in pertinent part:

    "(2) **By order of Court.** Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper...."

8. Plaintiffs are prevented, however, from reasserting an aiding and abetting claim against defendant Arthur Andersen because, as discussed below, the court has concluded that Andersen is not liable as a matter of law for the alleged misrepresentations contained in FOL's 1987 Prospectus and Registration Statement at issue in this case.

for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

### B. *Standard of Materiality*

■ Under each of the five remaining counts, plaintiffs must establish that the Registration Statement and Prospectus used by FOL for the 1987 public offering of securities contained material misrepresentations or omissions. *See* 1933 Act, § 11(a), 15 U.S.C. § 77k; 1934 Act, § 10(b), 15 U.S.C. § 78j. "The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976). In considering whether summary judgment on the issue of materiality is appropriate, the court must consider "that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality." *Id.* "The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* Only if the established misrepresentations or omissions are so obviously important or so obviously unimportant to an investor, that reasonable minds cannot differ on the question of materiality, can the ultimate issue of materiality be appropriately resolved as a matter of law at the summary judgment stage. *Id.* (citations omitted).

■ The United States Supreme Court has explicitly defined the standard of materiality under securities statutes:

> [T]o fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries,* 426 U.S. at 448–49, 96 S.Ct. at 2132). "[M]ateriality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it." *In re Donald J. Trump Casino Securities Litigation,* 7 F.3d 357, 369 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). "In other words, a particular misrepresentation or omission significant to a reasonable investor in one document or circumstance may not influence a reasonable investor in another." *Id.*

The Supreme Court has recognized that a " 'fundamental purpose' of the various Securities Acts, 'was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.' " *Basic,* 485 U.S. at 234, 108 S.Ct. at 985 (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). The role of the materiality requirement, however, is "to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." *Basic,* 485 U.S. at 234, 108 S.Ct. at 985 (citations omitted).

### C. *Rule 175*

■ Liability under the securities laws may be predicated on publicly released predictions and optimistic statements about a company's future. *See, Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 512–16 (7th Cir.1989); *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("[P]rojections and general expressions of optimism may be actionable under the federal securities laws."). Certain types of forward-looking statements made in a document filed with the SEC in connection with an offering of securities, however, are protected by Rule 175, one of the many "safe harbors" established by the SEC on the authority of § 19(a) of the 1933 Act, 15 U.S.C. § 77s(a). *See* 17 C.F.R. § 230.175. Rule 175 provides in relevant part as follows:

> (a) A statement within the coverage of paragraph (b) ... which is made by or on behalf of an issuer ... shall be deemed not to be a fraudulent statement (as defined in

paragraph (d) or this section), unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.

(b) This rule applies to the following statements:

(1) A forward-looking statement (as defined in paragraph (c) of this section) made in a document filed with the Commission . . .

(c) For the purpose of this rule the term "forward-looking statement" shall mean and shall be limited to:

(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

(2) A statement of management's plans and objectives for future operations;

(3) A statement of future economic performance contained in management's discussion and analysis of financial condition and results of operations . . .

(4) Disclosed statements of the assumptions underlying or relating to any of the statements described in paragraphs (c)(1), (2), or (3) of this section.

(d) For the purpose of this rule the term "fraudulent statement" shall mean a statement which is an untrue statement of a material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading, or which constitutes the employment of a manipulative, deceptive, or fraudulent device, contrivance, scheme, transaction, act, practice, course of business, or an artifice to defraud, as those terms are used in the Securities Act of 1933 or the rules or regulations promulgated thereunder.

"Rule 175 implies that once the issuer shows it has made a 'forward-looking statement', the burden of persuasion concerning 'reasonable basis' and 'good faith' rests with the plaintiff." *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 513 (7th Cir.1989). "A company's predictions of future performance are protected so long as they have a reasonable basis in fact—a poor prediction will not automatically subject a company to suits under the securities laws." *Arazie v. Mullane,* 2 F.3d 1456, 1466 (7th Cir.1993) (citing *Wielgos,* 892 F.2d at 513–14).

### 1. *Disclosed Projections*

In this case, defendants argue that any statements regarding FOL's tax obligations, environmental liabilities, and operating capacity should be considered forward-looking statements within the meaning of Rule 175. In addition, defendants argue that any statements they made in the Registration Statement and Prospectus regarding the future financial liabilities and future performance of FOL are protected by Rule 175's safe harbor because the statements had a reasonable basis in fact and were made in good faith.

Plaintiffs respond that Rule 175's safe harbor provisions should not apply to the statements at issue in this case because these statements are not properly characterized as forward-looking statements as defined by Rule 175. Plaintiffs contend that the statements and omissions regarding FOL's tax obligations, environmental liabilities and operating capacity were known material facts about FOL's condition as it existed at the time the statements were made, not projections about future performance. Therefore, plaintiffs argue, the protections of Rule 175 should not apply to the type of alleged misstatements of facts and omissions at issue in this case.

■ Regarding possible future tax liability, FOL stated in the Prospectus, "the Company believes that its ultimate deficiency, before interest, will be substantially less than the amounts asserted and that it has adequately provided for any additional taxes and interest."[9] Regarding possible future environmental liability, FOL stated in the Prospectus, "the Company believes that these matters will not have a material effect on its

---

**9.** *Contingent Liabilities, Notes To Consolidated Financial Statements (Prospectus),* at F–17, *Endo Exhibits,* Volume I, Ex. 1.

business or financial condition."[10] The court finds that defendants' statements regarding the effect that FOL's possible future tax and environmental liabilities may have on the future financial condition of the company clearly constitute forward-looking statements as defined in Rule 175. *See* Rule 175(c)(1) (forward-looking statements include projections of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items).

The court also finds, however, that plaintiffs have presented evidence indicating the possibility that defendants' statements regarding FOL's future tax and environmental liabilities lacked a reasonable basis in fact and were made in bad faith. Plaintiffs' evidence raises the inference that defendants issued misleading positive statements about FOL's potential tax and environmental liabilities while defendants possessed information that contradicted or, at a minimum, seriously undermined their confidence in the figures that management issued.

For example, with respect to FOL's potential tax liabilities plaintiffs' evidence indicates the possibility that defendants knew as early as 1985 that FOL's tax liability may exceed $105 million.[11] In addition, plaintiff has presented evidence indicating that the head of FOL's tax department, Earl Shanks, in a memorandum to William Farley, Chairman of the Board and Chief Executive Officer of FOL, acknowledged that the vast bulk of the tax claim against FOL had been settled in June 1985 for $44 million, and estimated that FOL's tax liability, with interest, would total approximately $120 million and would be required to be paid in late summer of 1987 unless the company could stall the payment.[12]

Plaintiffs' evidence demonstrates that these projections differed from the estimates and projections disclosed to the public in connection with the 1987 public offering which raises the inference that the estimates and projections included in the 1987 Registration Statement and Prospectus lacked a reasonable basis in fact and were made in bad faith. *See e.g., In re Compaq Securities Litigation,* 848 F.Supp. 1307, 1317–19 (S.D.Tex.1993) (genuine issue of material fact existed concerning defendants' liability for the allegedly false or misleading nature of the defendants' publicly released projections when these statements are viewed in light of all the information that was disclosed to the market and the information that was available only to the management at the time each statement was made).

The testimony and documents submitted by defendants do not negate the genuine issue of material fact that the figures released to the public in FOL's 1987 Registration Statement and Prospectus regarding FOL's tax deficiencies may not have accurately reflected the information available to FOL management throughout the relevant time period. For purposes of a motion for summary judgment, plaintiffs' evidence must be believed and all justifiable inferences from that evidence must be drawn in plaintiffs' favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Therefore, the court cannot ignore the reasonable inferences raised by plaintiffs' evidence that these undisclosed figures regarding FOL's future tax liabilities resulted in misleading and inadequate disclosure. Defendants must rebut the inferences raised by plaintiffs' evidence that

**10.** *Contingent Liabilities, Notes To Consolidated Financial Statements (Prospectus),* at F–12 and F–13, *Endo Exhibits,* Volume I, Ex. 1.

**11.** In support of their argument plaintiffs point to both the Management Discussion and Analysis Section and the Notes to the financial statements of FOL's 10–K report filed with the SEC for the year ending December 31, 1985 which stated:

The Company has filed two petitions with the United States Tax Court contesting statutory notices of deficiencies. The first involves approximately $60,000,000 of alleged deficiencies covering the years 1970 through 1975, and

the second approximately $45,000,000 for the years 1976 and 1977. Although the Company believes that its ultimate deficiency, before interest will be substantially less than the amount asserted and that it has adequately provided for any additional taxes and interest, the cash payment to the internal Revenue Service, including interest, may exceed the amounts of alleged deficiencies.

*Plaintiffs' Rule 12(m) Statement,* at ¶ 38; *Endo Exhibits,* Volume II, Ex. 20.

**12.** *Plaintiffs' Rule 12(m) Statement,* at ¶ 41; *Endo Exhibits,* Volume I, Ex. 14 and Shanks Dep., Volume III, Ex. 55, at 96–98, 100–104.

defendants' statements in the Prospectus and Registration Statement regarding FOL's potential tax liabilities were made in bad faith and without a reasonable basis. Therefore, the court cannot find as a matter of law that Rule 175's safe harbor provisions protect defendants' predictions regarding Fruit of the Loom's potential tax liabilities.

In addition, with regard to potential environmental liabilities, plaintiffs' evidence indicates the possibility that defendants failed to adequately disclose FOL's contingent environmental liabilities including the liabilities of FOL's former subsidiary Velsicol Chemical Company. More specifically, plaintiffs' evidence raises the inference that defendants' statement in the 1987 Prospectus that FOL's contingent environmental liabilities would not have a material effect FOL's business or financial condition, was not made in good faith and lacked a reasonable basis in fact. For example, in support of their arguments, plaintiffs point to defendants' detailed description of FOL's environmental liabilities in FOL's 1985 10–K that substantial expenditures would be required over the next several years to fund FOL's environmental liabilities.[13]

▅▅▅▅ In fact, defendants do not dispute that FOL may have to pay a substantial amount for Velsicol's environmental liabilities. Defendants argue, however, that the combination of the statements in the Prospectus and newspaper articles on the topic should have provided an ordinary investor with the necessary information regarding the magnitude of Velsicol's environmental liabilities.[14] Therefore, defendants claim, omissions of the details regarding Velsicol's future environmental liabilities, including the potential dollar amount, were immaterial and should not result in the defendants' liability.

▅▅▅▅ "Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public." *In re Apple Computer Securities Litigation,* 886 F.2d 1109,

1114 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). In addition, even if public availability could render the omissions immaterial, "in order to avoid Rule 10b–5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Id.* at 1116.

This court cannot find that the omission of information regarding over $60 million in potential environmental liability is not so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality. The court also finds that the information regarding Velsicol's potential environmental liabilities was not sufficiently public to render defendants' omission immaterial as a matter of law. Contrary to defendants' suggestions, a reasonable investor may have required further information about the estimated amounts of FOL's future expenditures for contingent environmental liabilities and the method of funding these liabilities. Therefore, the ultimate issue of materiality regarding FOL's potential environmental liability cannot be appropriately resolved as a matter of law at the summary judgment stage of the case.

### 2. Duty to Disclose Forward–Looking Information

▅▅▅▅ Plaintiffs allege that defendants failed to disclose certain forward-looking information regarding FOL's future capital expansion. More specifically, plaintiff claim that defendants were required to disclose that the Company was operating at or near 100% capacity and would be required to borrow substantial additional funds for capital expansion.

Until the SEC adopted Rule 175 in 1978, "the SEC discouraged firms from making projections or commenting beyond the domain of 'hard' information, such as last year's sales." *Wielgos,* 892 F.2d at 514 (citations

---

13. *See Plaintiffs' Rule 12(m) Statement,* at ¶ 25; *Endo Exhibits,* Volume II, Ex. 20.

14. Articles from 1986–87 in the *New York Times, Los Angeles Times, Crain's Chicago Business,* and

*The National Law Journal* discussed the *Sterling* judgment and FOL's future potential liability for Velsicol's environmental problems. *See* Fischel Dep., Ex. 8 for excerpts of these articles.

omitted). The purpose was to protect investors, who were viewed as unable to appreciate the uncertainty of predictions. With the adoption of Rule 175, however, the SEC assumes that prospective investors "are more sophisticated, can understand the limits of a projection—and that if any given reader does not appreciate its limits, the reactions of the many professional investors and analysts will lead to prices that reflect the limits of the information." *Id.* at 514 (citing Securities Act Release No. 5992, 43 Fed.Reg. 53246 (1978)).[15] "A belief that investors—collectively if not individually—can look out for themselves and ought to have information that may improve the accuracy of prices even if it turns out to be fallacious in a given instance underlies the very existence of Rule 175." *Id.*

As a result of the adoption of Rule 175 and the SEC's policy regarding undisclosed predictions, courts have begun to re-examine the position that an issuer's failure to disclose predictive information is always immune from liability under the securities laws and have adopted a variety of approaches for dealing with undisclosed predictions. *See Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 205 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). "These approaches range from continuing a prior practice of never requiring that predictive information be disclosed to formulating new standards which recognize that sometimes disclosure will be required." *Id.* The approaches vary among the circuits and sometimes within a circuit depending on the type of information at issue. *Id.* (citing *Walker v. Action Indus., Inc.,* 802 F.2d 703, 707–709 (4th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93

L.Ed.2d 1000 (1987)). In each case, however, regardless of the particular approach used, each court made its decision "by recognizing the statutory policy interests both in requiring and not requiring disclosure, by focusing on the nature of the particular predictive information whose lack of disclosure was questioned, and by determining what the specific facts surrounding that predictive information indicated about the information's importance, reliability, or impact on the potential investor." *Isquith,* 847 F.2d at 206.

The Seventh Circuit addressed the duty to disclose predictive information in *Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). In *Panter,* the Seventh Circuit held that while there is no general duty to disclose financial projections, it is "axiomatic that once a company undertakes partial disclosure of such information there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading." *Id.* at 292 (citing *Sunstrand Corp. v. Sun Chemical, Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977) (release of nine months earnings figures showing $1.16 earnings per share were made misleading by the failure to release existing accounting reports which defendants knew would require year-end write-offs resulting in a $0.15 loss per share) and *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489–92 (9th Cir.1974)). The court also found, however, that "projections, estimates, and other information must be reasonably certain before management may release them to the public." *Panter,* 646 F.2d at 292.

---

15. Just as the SEC decided not to require disclosure of forward-looking statements, it also decided not to require an issuer to reveal the data, assumptions, and methodology behind its disclosed projections. Rule 175(c)(4) *allows* the firm to reveal them, but their disclosure is not a condition to the application of the safe harbor. *See Wielgos,* 892 F.2d at 515. The SEC emphasized, however, its position on the significance of the disclosure of assumptions:

Under certain circumstances the disclosure of underlying assumptions may be material to an understanding of the projected results. The Commission also believes that the key assumptions underlying a forward looking statement are of such significance that their disclosure may be necessary in order for such statements to meet the reasonable basis and good faith standards embodied in the rule. Because of the potential importance of assumptions to investor understanding and in order to encourage their disclosure, the rule as adopted indicates specifically that disclosed assumptions also are within its scope.

Safe Harbor Rule for Projections, Securities Act Release No. 6084, [1979 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 82,117 at 81,942 (July 5, 1979).

Applying these principals to the facts of the *Panter* case, the court concluded that there was no duty to reveal the financial projections contained in defendant's five-year planning report generated for internal management use because the projections were tentative estimates prepared for management purposes only with no expectation that the projections be made public. *Id.* at 293. *See also, Wielgos*, 892 F.2d at 516 (An issuer "may reveal the projection it thinks best while withholding others, so long as the one revealed has a 'reasonable basis'—a question on which the other estimates may reflect without automatically depriving the published one of foundation.").

Thus, in this case, in order for defendants' failure to disclose predictive information to be actionable, plaintiffs must prove that the undisclosed information that Fruit of the Loom was operating at or near 100% capacity and would be required to borrow substantial additional funds in the future for planned capital expansion was reasonably certain and that its disclosure was necessary to avoid making other statements regarding future capital expansion misleading. The court finds that there is a question of material fact regarding the duty to disclose the omitted information about future capital expansion. Plaintiff has presented evidence indicating that defendants knew but failed to disclose that FOL was operating at or near 100% capacity and would be required to borrow

substantial additional funds in the future for its planned capital expansion program.[16] In addition, there is a question of fact regarding whether a reasonable investor would find it important to the investment decision that the company would have to borrow substantial sums to finance proposed capital expansion. The court cannot ignore and is compelled in ruling upon defendants' motions to draw the reasonable inferences raised by plaintiffs' evidence that the disclosure of information regarding the funding for future capital expansion was necessary to avoid making other statements regarding capital expansion misleading.[17] Therefore, summary judgment on this issue is inappropriate.

### D. *Failure to Disclose the Sterling Case Judgment*

Plaintiffs allege that defendants failed to disclose in FOL's 1987 Prospectus the fact that on September 5, 1986, the United States District Court for the Western District of Tennessee entered a judgment of $22 million against Velsicol, a subsidiary of FOL, for environmental liabilities.[18] Defendants argue that they failed to include the $22 million judgment in the *Sterling* case because they believed, based on the advice of counsel, that the judgment would be reversed on appeal.[19]

The court finds that the fact that a judgment may be reversed on appeal or that the

---

16. In fact, plaintiffs have presented evidence indicating the possibility that, while not disclosed in the Prospectus, as early as September 12, 1986, FOL had made arrangements to borrow $75 million the year 1987 to fund FOL's capital expansion program. *See Plaintiffs' 12(m) Statement*, at ¶ 55; *Endo Exhibits*, Volume III, Ex. 61.

17. The court agrees with Judge Alesia's statement in his January 29, 1993 order that the court does not believe that, "just because the Prospectus stated the Company was undergoing capacity expansion, this tells the reasonable investor that the Company is operating at 100% capacity." *Endo*, 812 F.Supp. at 1492. In addition, the court agrees with Judge Alesia's finding that a reasonable investor may deem it important to the investment decision that the Company was operating at 100% capacity and would have to borrow substantial sums to finance future capital expansion. *Id.*

18. *See Sterling v. Velsicol Chemical Corp.*, 647 F.Supp. 303 (W.D.Tenn.1986), *aff'd in part and*

*rev'd in part*, 855 F.2d 1188 (6th Cir.1988). Because plaintiffs allege that this was a known fact at the time the 1987 Prospectus was issued as opposed to a prediction of a future event, Rule 175 safe harbor provisions do not apply as a matter of law.

19. The *Sterling* case was a class action brought against Velsicol Chemical, a subsidiary of FOL, for personal injuries and property damage resulting to residents who lived near Velsicol's chemical waste burial site. The court found Velsicol liable for plaintiffs' injuries resulting from ingesting, inhaling, using and being otherwise exposed to water contaminated by hazardous chemicals which escaped from Velsicol's burial site. The court awarded the five class representatives compensatory damages of over $5 million plus $9 million in pre-judgment interest, and all plaintiffs in the class $7.5 million in punitive damages. *See, Sterling*, 647 F.Supp. at 307–08.

case will eventually settle for an amount less than the original judgment does not make the existence of the judgment immaterial as a matter of law nor justify the omission of this information. *See Wilson v. Great American Indus., Inc.*, 855 F.2d 987, 991–92 (2nd Cir.1988) (failure to disclose judgment against a subsidiary was a material omission). Contrary to defendants' suggestion, the court concludes that a reasonable investor may have required further information about the *Sterling* case judgment before making an investment decision. Therefore, because reasonable minds can differ on the question of the materiality of failing to disclose the *Sterling* case judgment, this issue cannot be appropriately resolved as a matter of law.

### E. Loss Causation

█ It is fundamental to plaintiffs' securities claims that plaintiffs prove "loss causation." *See LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988).[20] "Loss causation" means that the investor would not have suffered a loss if the facts were what the investor believed them to be. *Id.* In order to show loss causation, the plaintiff must allege facts suggesting that "'but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains.'" *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir.1992) (quoting *Bastian*, 892 F.2d at 683). In other words, if the plaintiffs' investments failed not because of defendants' misrepresentations but because of industry factors that destroyed most of such investments,

"then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages." *Bastian*, 892 F.2d at 685 (citations omitted). "No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine tooth comb in the hope of uncovering a misrepresentation." *Id.*

█ In this case, defendants argue that plaintiffs have failed to adequately prove loss causation because the evidence shows that any loss plaintiffs incurred was as a result of a downturn in the stock market and other industry factors not defendants' alleged misrepresentations in the Registration Statement and Prospectus. Defendants have presented the deposition testimony of Professor Daniel Fischel to support their theory that the drop in the price of FOL stock was due to market and industry forces, not to any alleged misrepresentations by defendants.[21] Fischel testified in his deposition that when an investment in FOL stock on March 3, 1987 is compared with an identical investment in each of the stocks of seven other publicly traded men's and boy's underwear manufacturers, the performance of FOL stock generally follows the price movements of the stocks of those seven other companies during the class period.[22]

In response to defendants' motion and Professor Fischel's testimony, plaintiffs have submitted an affidavit from their own expert, Professor Paul Grier.[23] Grier states that he

---

**20.** The Seventh Circuit has suggested but has not held that a claim under § 12(2) must plead loss causation. *See Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). This court has previously held, however, following other courts in this district, that claims under § 12(2) must also plead loss causation. *See Robin v. Falbo*, No. 91 C 2894, slip op. at 3 n. 2, 1992 WL 188429 (N.D.Ill. July 23, 1992) (citing *Scholes v. Schroeder*, 744 F.Supp. 1419, 1423–24 (N.D.Ill.1990)).

**21.** Professor Fischel is currently the Lee & Brena Freeman Professor of Law at the University of Chicago Law School, specializing in corporate finance, regulation of financial markets and eco-

nomic analysis of the law. He is also the Executive Vice President of Lexecon Inc., an economic consulting firm providing economic analysis and consulting services in a wide variety of litigation, regulatory, and business contexts.

**22.** *See* Fischel Dep. at 398–411; Fischel Dep., Ex. 2 at Tabs 5A–E.

**23.** *See* Affidavit of Paul Grier, *Appendix to Plaintiffs' Local Rule 12(n) Statement*, Ex. 72 ("Grier Affidavit"). Professor Paul C. Grier is an Associate Professor of Finance in the School of Management at State University of New York at Binghamton specializing in corporate finance, investments and portfolio theory. He is also a consultant in the areas of stock valuations as well as present value of foregone earnings.

has concluded, based on his own study of the movement of the stock market as a whole and the movement of securities in FOL's industry, that the majority of the drop in prices of FOL's securities during the relevant time period was attributable to causes other than market and industry factors such the disclosure of negative information by FOL.[24] Grier criticizes Fischel's finding that market forces caused the price of FOL stock to fall because Grier believes that the companies Fischel selected for his analysis of the stock market were inappropriate.[25] Grier states that Fischel selected some companies which were not comparable to FOL because they were not primarily apparel manufacturers.[26] Grier's analysis of the effect of market forces on FOL's securities shows that for the relevant time period, market factors could account for 27% of the amount of the price drop in FOL's 10¾% notes and 11% of the amount of the price drop in the 6¾% convertible debentures.[27]

The court finds that there is a genuine issue of material fact regarding whether defendants' alleged misrepresentations and omissions caused plaintiffs to incur harm. Grier and Fischel disagree about the cause of plaintiffs' losses. Grier claims that plaintiffs' losses were caused by FOL's undisclosed contingent liabilities while Fischel contends that the drop in the price of FOL's securities was due solely to market and industry forces. Both experts provide data and reasoned analyses to support their respective opinions. This court's function at the summary judgment stage of the case is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Therefore, because the court finds that there is a genuine dispute over the issue of causation, summary judgment on this issue is inappropriate.

## F. *Motion to Strike*

◼ The FOL defendants have filed a motion to strike the affidavit of Paul Grier submitted by plaintiff in opposition to defendants' motions for summary judgment. The FOL defendants argue in support of their motion that Grier's affidavit and accompanying exhibits contains additional analyses regarding the causation issue which were not provided to defendants until three months after the expert discovery cut-off date and two months after defendants filed their motions for summary judgment. Defendants contend that plaintiffs' delay in providing Grier's affidavit is a flagrant violation of the discovery rules.

Federal Rule of Civil Procedure 26(e) states that a party is under a duty "seasonably to supplement the response with respect to any question directly addressed to ... the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony." Rule 26(e)(1)(B). The court finds that plaintiffs adequately complied with the requirements of Rule 26(e)(1)(B) by filing Grier's affidavit within a reasonable time after the necessary information became available. Grier's affidavit was prepared and filed to rebut the evidence of defendants' expert, Professor Fischel, regarding the loss causation issue. Fischel's use of an industry analysis to address the loss causation issue was not clear until after defendants' motions for summary judgment were filed. It is not unreasonable that Grier first addressed Fischel's arguments in an affidavit responding to defendants' motion. Therefore, FOL's motion to strike Grier's affidavit for failing to comply with the discovery rules is denied. The court will allow defendants, however, to depose Grier solely on the issue of loss causation if defendants find it necessary to adequately prepare their case.

◼ In addition, to the extent that Grier's affidavit contradicts his previous sworn deposition testimony, the court will rely on

---

24. Grier Affidavit, at ¶ 2.

25. *Id.* at ¶ 5.

26. *Id.* For example, Sara Lee Corporation, a company used by Fischel in his comparison, is a conglomerate and its total apparel sales represent only 11.5% of the company's total net sales.

27. *Id.* at ¶ 11.

Grier's deposition testimony on summary judgment and disregard subsequent, contradictory affidavit statements because, "[i]nherently depositions carry an increased level of reliability." *Darnell v. Target Stores,* 16 F.3d 174, 176 (7th Cir.1994) (Seventh Circuit held that when a district court is faced with contradicting deposition testimony and affidavit statements from the same person, the conclusory statements in an affidavit cannot create a conflict with plain admissions in deposition testimony.).

Defendants also argue that the court should strike ¶ 13 of Grier's affidavit because it violates this court's October 18, 1993 order. On October 15, 1993 this court ordered in open court that Grier may not testify about subjects not included in plaintiffs' summary and supplemental summary of Grier's opinions or in the summary of the testimony of Robert Winborne, a former expert witness whom plaintiff withdrew in September of 1993.[28] Because ¶ 13 of Grier's affidavit offers Grier's opinion on fraud-based 10b–5 damages plaintiffs allegedly suffered and this subject was included in Winborne's expert testimony summary provided by plaintiffs under the heading "Fraud Based Claims", the court also denies FOL defendants' motion to strike as to this paragraph.[29]

### G. *Reliance Requirement of § 10(b)*

■■■■ Defendants argue that plaintiffs are unable to establish actual reliance, a required element of Rule 10b–5 claim, as a matter of law to support their § 10(b) claim.[30] More specifically, defendants contend that plaintiffs cannot rely on the fraud-

on-the-market-theory to establish reliance because the theory does not apply to an initial public offering. Plaintiffs argue that proof of reliance is not required in securities cases involving a failure to disclose material information.

■■■ The court agrees with defendants that reliance is a required element of a Rule 10b–5 cause of action. *See Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) (citations omitted).[31] "Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Id.* (citations omitted). Actual proof of reliance, however, is not always necessary. Recognizing the difficulty of proving actual reliance in class action securities cases, the Supreme Court has "dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that necessary nexus between the plaintiffs' injury and the defendant's wrongful conduct had been established." *Id.* (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972)). The Supreme Court has found that it is appropriate for a court to apply a presumption of reliance supported by the fraud-on-the-market theory in cases where a duty to disclose material information has been breached. *Basic,* 485 U.S. at 250, 108 S.Ct. at 993.

The Supreme Court has adopted the following description of the fraud-on-the-market theory:

1987 Registration Statement and Prospectus. Therefore, the court finds that plaintiffs have produced evidence showing the possibility that defendants acted with the intention to defraud investors when issuing the 1987 Registration Statement and Prospectus containing alleged misrepresentations and material omissions.

**28.** *See* Minute Order of October 18, 1993; Transcript of October 15, 1993 hearing, *FOL Defendants' Motion to Strike,* Ex. 7.

**29.** *See Id.* at Ex. 10, p. 2.

**30.** Defendants also argue that plaintiffs have failed to produce any evidence to show that defendants acted with scienter. Scienter is a required element of a Rule 10b–5 cause of action. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Id.* This court has already found that there is a genuine issue of fact regarding whether defendants were aware of the extent of FOL's contingent tax and environmental liabilities and knowingly failed to disclose this information in the

**31.** In *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1129 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 883, 127 L.Ed.2d 78 (1993), the Seventh Circuit held that "reliance is a *means* by which the plaintiff may establish that material misstatements or omissions caused him injury," rather than a required element of a § 10(b) claim. *Id.*

'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.'

*Basic*, 485 U.S. at 241–42, 108 S.Ct. at 988–89 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3rd Cir.1986)).[32]

■ In this case, defendants argue that plaintiff cannot rely on the fraud-on-the-market theory to establish the rebuttable presumption of fraud because in an initial public offering no trading market exists upon which investors may rely. Rather, defendants argue, relying on the Seventh Circuit's decision in *Eckstein*, that the price of the securities is determined by the Company and its underwriters based on public demand, not by the available material public information regarding the company and its business, making use of the fraud-on-market-theory to establish reliance inappropriate.

The court disagrees with defendants' assessment of *Eckstein* and finds that plaintiffs are not precluded from presenting the fraud-on-the-market theory in this case to establish investor reliance. In *Eckstein*, the Seventh Circuit did not eliminate, as defendants suggest, use of the fraud-on-the-market theory in all initial public offering cases. The court merely held that the specific circumstances of the initial public offering at issue in the *Eckstein* case prevented the plaintiffs from using the theory to establish reliance.[33] *Eckstein*, 8 F.3d at 1130. The court held that because the stock at issue in the case was thinly traded in an undeveloped market, and not "eagerly followed by astute investors with the capital to turn their views into movements in price," the price of the stock did not reflect that availability of public information, resulting in an "inefficient" market price. *Id.* Because the stock in *Eckstein* was not traded in an efficient, impersonal, national market and the price of the stock was not affected by the availability of public information, the court found that the *Eckstein* plaintiffs could not show causation through the fraud-on-the-market theory. *Id.*

In this case, however, unlike in *Eckstein*, a number of factors indicate that the trading market for FOL stock was sufficiently efficient to presume plaintiffs' reliance based on a fraud-on-the-market theory. These factors include: 1) the issuance of a substantial volume of securities;[34] 2) a large number of investors; 3) the direct involvement of many underwriters in the offering;[35] and 4) the existence of an impersonal, national trading market where the price of the stock is much more likely to reflect the public availability of information.[36] Because the court finds that

**32.** *See also,* Comment, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context,* 58 U.Chi.L.Rev. 1393 (1991).

**33.** In *Eckstein,* the complaint alleged that the initial offering price of $1,000 per partnership interest was determined solely by the issuer. In addition, the complaint stated that the issuer maintained the $1,000 price even though the offering was not fully subscribed. The lower court concluded these allegations alone indicate that the market which existed for the partnership interests did not affect their price, and that the price of the partnership interests did not reflect publicly available information. *Eckstein v. Balcor Film Investors,* 740 F.Supp. 572, 582 (E.D.Wis.1990), *aff'd,* 8 F.3d 1121 (7th Cir.1993).

**34.** The 1987 initial public offering at issue in this case, which raised approximately $620 million, consisted of more than 31 million shares of Class A common stock, priced at $9.00 per share; $60 million principal amount of 6¾% convertible subordinated debentures due in 2002; and $280 million principal amount, including over-allotment options, of 10¾% senior subordinated notes due in 1995.

**35.** Merrill Lynch Capital Markets, Shearson Lehman Hutton Inc., and Dean Witter Reynolds all were Managing Underwriters for the March 3, 1987 initial public offering and currently serve as representatives for a defendant class of underwriters including all of the 106 underwriters of the 1987 public offering of FOL stock.

**36.** *See Eckstein,* 8 F.3d at 1130 (citing Comment, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context,* 58 U.Chi.L.Rev. 1393, 1414 (1991)). From the date of the offering until December 1993, FOL's stock has been listed on the American Stock Exchange. FOL is currently listed on the New York Stock Exchange.

the trading market for the FOL initial public offering at issue in this case was efficient, and that the price of the FOL securities reflected the available material information regarding the company and its business, plaintiffs are not precluded from using the fraud-on-the-market theory in this case to establish reliance for their Rule 10b–5 claim.

## III. *Liability of Accounting Firm Defendants*

Plaintiffs claim that the accounting firm defendants, Ernst & Young and Arthur Andersen violated the securities laws by failing to include material information in the financial section of the 1987 Prospectus and Registration Statement regarding FOL's contingent tax and environmental liabilities. Plaintiffs claim that the respective financial statements audited by the accounting firm defendants misled potential investors about the effect these contingent liabilities would have on FOL's future profitability.

### A. *Ernst & Young*

█ From approximately June 1986 to the present, defendant Ernst & Young ("E & Y"), or its predecessor Arthur Young & Co., served as FOL's outside auditor. As the outside auditor for FOL, E & Y conducted an audit of FOL's financial statements for the year ending December 31, 1986, expressed an opinion that those financial statements fairly presented the consolidated financial position of FOL and its subsidiaries as of that date.[37]

The audit report of E & Y, which was included in the 1987 FOL Prospectus, stated as follows:

We have examined the Consolidated Balance Sheet of Fruit of the Loom, Inc. and Subsidiaries as of December 31, 1986 and the related Consolidated statements of Operations and Changes in Financial Position for the year then ended. Our examination was made in accordance with generally accepted auditing standards and, accordingly, included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

In our opinion, the statements referred to above present fairly the consolidated financial position of Fruit of the Loom, Inc. and Subsidiaries as of December 31, 1986 and the consolidated results of operations and changes in financial position for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the prior period.

*Report of Independent Certified Public Accountants (Prospectus)*, at F–2, *Endo Exhibits*, Volume I, Ex. 1.

In addition, the 1987 Prospectus stated the following regarding the status of E & Y with regard to the public offering:

The consolidated balance sheet of the Company as of December 31, 1986 and the related consolidated statements of operations and changes in financial position for the year ended December 31, 1986 included in this Prospectus and elsewhere in the Registration Statement of which this Prospectus is a part, have been examined by Arthur Young & Company, independent public accountants, as indicated in their report with respect thereto, and are included herein in reliance upon the authority of such firm as experts in accounting and auditing.

*Experts, (Prospectus)*, at 31, *Endo Exhibits*, Volume I, Ex. 1.

█ Section 11 of the Securities Act of 1933 permits an accountant to be sued for certifying or preparing any financial report included in a registration statement or prospectus which contains a material misrepresentation or omission, unless the accountant is able to establish a due diligence defense. *See* 15 U.S.C. § 77k. To establish a due diligence defense the accountant must prove the following:

**37.** *See Complaint*, at ¶ 16; Cerbone Dep., at 10, 15, 25–26.

(i) he had, after reasonable investigation, reasonable grounds to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3)(B)(i). This means that "accountants are expected to investigate, to various degrees, facts supporting and contradicting inclusions in registration statements. They must undertake that investigation which a reasonably prudent man in that position would conduct." *In re Software Toolworks, Inc. Securities Litigation*, 789 F.Supp. 1489, 1510 (N.D.Cal.1992) (citations omitted). *See also, Escott v. Barchris Const. Corp.*, 283 F.Supp. 643, 703 (S.D.N.Y.1968) (accountants held to standards of their own profession, Generally Accepted Auditing Standards ("GAAS") and the Generally Accepted Accounting Principles ("GAAP")).

Plaintiffs argue that E & Y is not entitled to summary judgment as to its due diligence defense because E & Y did not have reasonable grounds to believe that the financial statements it prepared were not misleading. Plaintiffs do not contest the fact that E & Y conducted an investigation of FOL's financial condition as of December 31, 1986, but instead contest the reasonableness of E & Y's belief about the accuracy of FOL's financial statements.

Plaintiffs claim that E & Y failed to comply with the requirements of GAAP by failing to make adequate disclosures regarding FOL's contingent tax and environmental liabilities in the Prospectus and Registration Statement. More specifically, plaintiffs' accounting expert Professor Dan Givoly testified that E & Y should have listed the 1970–77 tax deficiency on FOL's balance sheet as a current liability rather than as a long-term noncurrent liability, in light of the fact that during 1986 this contingent liability became more imminent and increased by $35 million.[38] Givoly stated that, in his opinion, the omission of an updated discussion of FOL's tax deficiencies and their potential effect on FOL's future cash flow, liquidity and profitability represents inadequate disclosure and is misleading to investors in that it creates the false impression that the matter is immaterial and will have no effect on FOL's future profitability.[39]

In addition, Givoly testified that E & Y violated the securities laws because it failed to require a more detailed description of the magnitude FOL's existing and contingent environmental liabilities, including disclosure of the *Sterling* judgment and disclosure of FOL's increase in its provision for environmental matters in 1986 from $50 million to $100 million.[40]

The court finds that there is a question of fact as to the issue of defendant E & Y's due diligence defense. Accepting plaintiffs' evidence as true and drawing all justifiable inferences in plaintiffs' favor as the court must on summary judgment, defendant E & Y is unable to prove as a matter of law that it reasonably believed that the statements in the Prospectus regarding FOL's contingent tax and environmental liabilities were not misleading. A due diligence defense would not be successful where a party possess sufficient information to conclude that a prospectus contains material misrepresentations or omissions regarding the financial condition of a company, as plaintiffs' evidence suggests in this case. E & Y's arguments as to the unreliability of Professor Givoly as an expert witness are properly addressed to the jury to discredit his testimony, not to this court in a motion for summary judgment. Therefore, the court finds that at this stage of the litigation it cannot find as a matter of law that defendant is entitled to summary judgment as to its due diligence defense.[41]

---

38. Givoly Dep. at 368–69.

39. *Summary of Preliminary Opinion—Dan Givoly ("Givoly Opinion")*, at 2, *Endo Exhibits*, Volume II, Ex. 31.

40. Givoly Dep. at 390–91; *Givoly Opinion*, at 6, *Endo Exhibits*, Volume II, Ex. 31.

41. In addition, because plaintiffs' evidence raises the inference that defendant E & Y knowingly failed to include allegedly material information regarding the extent of FOL's contingent and environmental liabilities, the court cannot conclude as a matter of law that E & Y lacked the requisite scienter for liability under § 10 and Rule 10b–5.

B. *Arthur Andersen*

■ Prior to 1986, defendant Arthur Andersen ("Andersen") served as outside auditors to Northwest Industries (the predecessor of FOL) for several years.[42] As Northwest's auditor, Andersen examined Northwest's financial statements for the year ending December 31, 1984 and the seven months ending July 31, 1985, and rendered a report stating that those financial statements fairly represented Northwest's financial position.[43] In July 1985, Northwest was acquired in a leveraged buyout by Farley/Northwest Industries, Inc., which subsequently changed its name to Fruit of the Loom, Inc.[44] After that acquisition, FOL retained Andersen to audit its financial statements for the year ending December 31, 1985. In the course of that engagement, Andersen provided FOL's board of directors with a report, dated March 27, 1986, stating that FOL's 1985 financial statements fairly presented the company's financial position as of December 31, 1985.[45]

Shortly after completing its audit of FOL's 1985 financial statements, Andersen was dismissed as FOL's outside auditor and was replaced by defendant E & Y. Although Andersen was replaced by E & Y as FOL's outside auditor in mid–1986, Andersen updated and reissued the 1985 FOL financial statements for inclusion in the Prospectus for FOL's 1987 offering.[46]

Plaintiffs' claims against Andersen are based on Andersen's recertification of FOL's 1985 financial statements which contained information that plaintiffs allege Andersen knew was misleading and incomplete. Plaintiffs contend that Andersen's recertification violated the Generally Accepted Auditing Standards ("GAAS") and the Generally Accepted Accounting Principles ("GAAP"), as well as the disclosure requirements of the securities laws' provisions for experts. Plaintiffs essentially allege that Andersen should have withheld its consent to the recertification of FOL's 1985 financial statements until FOL or FOL's current auditor, E & Y, made additional disclosures regarding FOL's contingent tax and environmental liabilities and FOL's operating capacity.

The GAAS contain specific provisions that define the duties and responsibilities of a predecessor auditor asked to allow its audit reports on prior financial statements to be included in a registration statement or prospectus. Those provisions are contained in the Statement on Auditing Standards Number 37 ("SAS 37"), which all parties agree is the controlling standard with respect to Andersen's obligations as FOL's predecessor auditor. Under SAS 37, a predecessor auditor is responsible only for determining whether any previously unknown matters or subsequent events have materially affected the accuracy of the prior financial statements on which the predecessor auditor reported.[47]

---

**42.** *Complaint,* at ¶¶ 15(a)–(b); Wilkinson Dep. at 9–11.

**43.** *Andersen's Rule 12(m) Statement,* at ¶ 1.

**44.** *Complaint,* at ¶¶ 27(a), 28(a); Wilkinson Dep. at 11.

**45.** *Id.,* Ex. A at F–3, F–4.

**46.** *Andersen's Rule 12(m) Statement,* at ¶ 4.

**47.** More specifically, SAS 37 provides in relevant part as follows:

    11. A registration statement filed with the Securities and Exchange Commission may contain the reports of two or more independent auditors on their audits of the financial statements for different periods. An auditor who has audited the financial statements for prior periods but has not audited the financial statements for the most recent audited period included in the registration statement has a responsibility relating to events subsequent to the date of the prior-period financial statements, and extending to the effective date, that bear materially on the prior-period financial statements on which he reported. Generally, he should

a. Read pertinent portions of the prospectus and of the registration statement.

b. Obtain a letter of representation from the successor independent auditor regarding whether his audit (including his procedures with respect to subsequent events) revealed any matters that, in his opinion, might have a material effect on the financial statements reported on by the predecessor auditor or would require disclosure in the notes hereto.

In this case, plaintiffs argue that defendant Andersen failed to comply with the requirements of SAS 37 by recertifying the 1985 financial statements. Plaintiffs do not contend that the 1985 financial statements were inaccurate at the time they were issued. Plaintiffs instead claim that by reissuing its certification of the 1985 financial statements without requiring FOL and E & Y to make the necessary changes and adequate disclosures regarding FOL's contingent tax and environmental liabilities, Andersen failed to comply with the requirements of the GAAS.

Defendant Andersen argues that plaintiffs have produced no evidence to suggest that Andersen failed to take the steps required by SAS 37. Defendant Andersen claims that none of alleged material omissions (relating to FOL's contingent tax and environmental liabilities) affected the accuracy of the prior-period financial statements on which Andersen reported. Therefore, under SAS 37, Andersen argues, it had no duty to qualify or withhold its recertification of FOL's 1985 financial statements, nor did it have any duty to require FOL or E & Y to make any additional disclosures regarding the allegedly misrepresented matters.

The court agrees with defendant Andersen's assessment of the evidence and finds that the undisputed facts show that Andersen complied with the requirements of SAS 37 and was under no duty to require FOL or E & Y to make any additional disclosures regarding FOL's contingent tax and environ-mental liabilities. Plaintiffs' accounting expert Dan Givoly agreed that the obligations imposed by SAS 37 are limited in scope to those matters which materially affect the financial statements reported on by the predecessor auditor.[48] The evidence shows that the omitted information regarding FOL's contingent tax and environmental liabilities did not have any effect on the accuracy on FOL's 1985 financial statement prepared and recertified by defendant Andersen.[49]

In addition, the undisputed facts show that, pursuant to the requirements of SAS 37, Andersen read the relevant sections of the FOL's 1987 Prospectus and Registration Statement and communicated with E & Y, the outside auditors of FOL's 1986 financial statements, to ensure that there were no previously unknown matters or subsequent events that had come to E & Y's attention which materially affected the accuracy of FOL's 1985 financial statements prepared by Andersen.[50] As part of the required post-audit procedures, Andersen also obtained a letter of representation from E & Y regarding whether its audit revealed any matters that, in its opinion, might have a material effect on the financial statements reported on by Andersen. Andersen received two letters from E & Y, dated March 2, 1987 and March 10, 1987, advising Andersen that E & Y was not aware of any subsequent matters or events that materially affected the financial

---

The auditor should make inquiries and perform other procedures that he considers necessary to satisfy himself regarding the appropriateness of any adjustment or disclosure affecting the prior-period financial statements covered by his report.

12. If, subsequent to the date of his report on audited financial statements, the auditor (including the predecessor auditor) (a) discovers, in performing the procedures described in paragraphs .10 and .11 above, subsequent events that require adjustment or disclosure in the financial statements or (b) becomes aware that facts may have existed at the date of his report that might have affected his report had he then been aware of those facts, he should follow the guidance in sections 560 and 561. If the client refuses to make appropriate adjustment or disclosure in the financial statements for a subsequent event or subsequently discovered facts, the auditor should also con- sider, probably with the advice of his legal counsel, withholding his consent to the use of his report on the audited financial statements in the registration statement.

**48.** Givoly Dep. at 377.

**49.** For example, Givoly testified at his deposition that the increase in the provision for FOL's contingent tax liabilities recorded by FOL in 1986 had no effect on the accuracy of FOL's 1985 financial statements audited by Andersen. Givoly Dep. at 389. In addition, Givoly stated that the *Sterling* judgment and the $50 million increase in FOL's provision for contingent environmental liabilities recorded by FOL in 1986 was irrelevant to FOL's financial condition as of December 31, 1985. *Id.* at 365, 390–91.

**50.** Mark Dep. at 29–30, 132–33; Mark Affidavit, at ¶3 and Ex. A; Wilkinson Dep. at 37, 75, 84, 87, 169–70.

statements on which Andersen had reported.[51]

■ Therefore, because the undisputed facts establish that the allegedly withheld information that forms the basis of plaintiffs' misrepresentation claims did not have any effect on the accuracy of FOL's 1985 financial statements originally reported on and later recertified by Andersen, defendant Andersen had no duty to withhold its recertification or require any changes to be made in the Prospectus and Registration Statement.[52] Accordingly, the court finds that defendant Andersen is entitled to summary judgment as to each of the remaining counts of plaintiffs' complaint.

### IV. *Liability of Underwriter Defendants*

■ The Underwriter defendants[53] seek summary judgment on plaintiffs' sections 11, 12(2) and 10(b) claims against them. The Underwriters argue that the undisputed facts demonstrate that they conducted a reasonable investigation to discover and eliminate any false or misleading statements in FOL's 1987 Registration Statement and Prospectus, and therefore are exempted from sections 11 and 12(2) liability. The Underwriters further claim that they are entitled to summary judgment on plaintiffs' 10(b) claim because plaintiff cannot prove the necessary scienter to establish primary liability under 10(b).

Plaintiffs respond that summary judgment in favor of the Underwriters is inappropriate because plaintiffs' evidence establishes that the Prospectus was materially false and misleading and that the underwriter failed to conduct a reasonable investigation as to the accuracy of the Prospectus.

An underwriter who offers or sells a security by means of a prospectus which contains a material misstatement or omission is subject to sections 11 and 12(2) liability unless the underwriter is able to establish that it conducted a reasonable investigation regarding the accuracy of the Prospectus ("due diligence defense"). *Huddleston,* 459 U.S. at 382, 103 S.Ct. at 687; 15 U.S.C. § 77k. *See also, Ackerman v. Schwartz,* 947 F.2d 841, 845 (7th Cir.1991).

In this case, the Underwriters seek summary judgment on the issue of due diligence. They claim that the investigation they performed in connection with the 1987 FOL offering, including performing a detailed analysis of FOL's business and financial performance, as well as conducting numerous meetings with both FOL management and internal accountants and FOL's independent auditors and outside counsel, entitles them to the due diligence defense.[54]

**51.** *See* Mark Affidavit, at ¶ 4. Both of E & Y's letters stated the following:

[W]e wish to advise you that our examination of the financial statements of [FOL] at December 31, 1986 and for the year then ended and our inquiries with respect to events and transactions subsequent to December 31, 1985 did not reveal any events, transactions or matters that, in our opinion, would require modification of the financial statements for the periods ... on which you reported.

If anything comes to our attention prior to the filing date of the Form 10–K or the effective date of the Registration Statement that, in our opinion, could have a material effect on the financial statements of [FOL] examined by you, we will notify you promptly.

Mark Affidavit, at Exs. B and C.

**52.** In addition, the court finds that defendant Andersen is not liable under § 11 of the 1933 Act because none of the material omissions or misrepresentations alleged by plaintiffs were contained in the financial statement audited by Andersen. Defendant Andersen cannot be held liable under § 11 for alleged misrepresentations or inadequate disclosures in financial statements that Andersen did not prepare or certify. Plaintiffs simply have not alleged that the 1985 financial statements originally prepared and later recertified by Andersen contained any inaccuracies or misrepresentations both at the time they were prepared or at the time they were recertified. "Accountants are liable under § 11 only for those matters which purport to have been prepared or certified by them." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 n. 11, 103 S.Ct. 683, 687 n. 11, 74 L.Ed.2d 548 (1983). Therefore, plaintiffs § 11 claim against defendant Andersen must be dismissed.

**53.** Merrill Lynch, Shearson Lehman and Dean Witter serve as representatives for a defendant class of underwriters defined as "[a]ll of the 106 underwriters of the 1987 public offering of Fruit of the Loom stock."

**54.** More specifically, the Underwriter defendants state that their independent investigation of FOL in connection with the 1987 offering included: 1) visiting FOL facilities; 2) analyzing FOL's debt structure both before and after the offering; 3)

Plaintiffs contend that the Underwriters cannot establish a due diligence defense because the evidence establishes that the Underwriters failed to perform a reasonable investigation into FOL's contingent tax and environmental liabilities within the meaning of sections 11 and 12(2) of the 1933 Act. Plaintiffs do not contest the fact that the Underwriter defendants conducted an investigation of FOL's financial condition prior to the 1987 offering, but instead contest the reasonableness of the Underwriters' belief about the accuracy of the statement in FOL's Prospectus regarding FOL's contingent tax and environmental liability especially in light of the extensive discussion Underwriters had with FOL's management and the detailed analysis of FOL's business and financial condition the Underwriters conducted prior to the 1987 offering.

Under both section 11 and 12(2) the Underwriters are exempted from liability if they prove that, after conducting a reasonable investigation, they had reasonable grounds to believe and did believe, at the time the Prospectus and Registration Statement became effective, that the statements made were true and that there was no failure to state a material fact. *Software Toolworks,* 789 F.Supp. at 1496. This reasonable investigation does not require the Underwriter to perform an audit of the company. Underwriters " 'cannot be expected to possess the intimate knowledge of corporate affairs of inside directors, and their duty to investigate should be considered in light of their more limited access.' " *Id.* (quoting *Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544, 582 (E.D.N.Y.1971)). Underwriters may rely on managements's representations when it is reasonable to do so under the circumstances. "It would be unreasonable, for example, to solely rely on management's representations when said representations could have been reasonably

verified.". *Id.* (citing *BarChris,* 283 F.Supp. at 696–97). Underwriters cannot be expected, however, "to ferret out everything that management knows about the company; they only need to reasonably attempt to verify and believe the accuracy of the information in the prospectus." *Id.*

The facts of this case are different than most cases addressing the due diligence issue. In most cases, the key question regarding due diligence is whether the underwriter performed a reasonable investigation of the issuer's business, excusing the underwriter from failing to discover certain information about the company. For example, in the *Software Toolworks* case, the court found that the underwriters were entitled to a due diligence defense excusing them of their failure to discover the alleged misrepresentations in the prospectus because the underwriters interviewed the issuer's management; obtained written representations from the issuer's accountants and attorneys as to the accuracy of certain financial information; and followed up on any negative or questionable information that developed as a result of their investigation. 789 F.Supp. at 1496–1500. In granting summary judgment for the underwriters, the court found that the plaintiffs had not provided specific facts sufficient to establish that the underwriters knew of the material facts which were omitted or misrepresented in the prospectus, or recklessly closed their eyes to obvious facts which should have alerted them to the truth. *Id.* at 1499.

Unlike in *Software Toolworks,* there is no factual dispute regarding the Underwriters' knowledge of the alleged material facts which were omitted or misrepresented in FOL's 1987 Prospectus and Registration Statement. The evidence presented by both sides establishes the Underwriters' knowledge of the information regarding FOL's contingent tax and environmental liabilities. For example,

---

analyzing FOL's historical earnings; 4) analyzing FOL's balance sheet; 5) comparing FOL's performance with other companies in the same industry including historical and projected multiples of earnings; 6) analyzing FOL's historical and projected market share, market growth and competitive advantage; 7) discussing FOL's expansion plans and its ability to generate necessary funds; and 8) analyzing FOL's contingent tax and environmental liabilities. *See* Crowell Dep., at 20–23, 51–55, 84–87, 139–46, 204–07; Rex–Waller Dep., at 21–28, 87–90, 117–18; Schneider Dep., at 9–12, 22–25; Mayerfeld Dep., at 10, 24, 26; Bayly Dep., at 14, 16, 33, 38–42; Tohir Dep., at 23–24, 40–44, 55–56.

the Underwriters clearly were aware of the existence of the *Sterling* case judgment but decided that it was not material information required to be disclosed in the Prospectus. As this court has stated earlier, the question regarding the materiality of the information to a reasonable investor is for the jury to resolve, not for the court on summary judgment under the factual circumstances presented here.

The court finds that there is a question of fact regarding whether the Underwriters' had reasonable grounds to believe and did believe, at the time the Prospectus and Registration Statement became effective, that the statements regarding FOL's contingent tax and environmental liabilities were true and that there was no omission to state a material fact necessary to make the statements not misleading. Therefore, the court concludes that at this stage of the litigation it cannot find as a matter of law that the Underwriter defendants are entitled to summary judgment on the issue of due diligence.

## V. *Plaintiffs' Motion For Summary Judgment*

Plaintiffs have moved for partial summary judgment on Count II against defendant FOL and the Underwriter defendants arguing that their failure to disclose information regarding FOL's contingent tax and environmental liabilities and FOL's operating capacity were material as a matter of law. Because the court has already found for the reasons stated in the portions of this opinion addressing defendants' motions for summary judgment, that the ultimate issue of materiality regarding these alleged misrepresentations and omissions cannot be appropriately resolved as a matter of law, plaintiffs' motion for summary judgment must also be denied.

## CONCLUSION

For the reasons stated above, the FOL defendants' motion for summary judgment is DENIED; the FOL defendants' motion to strike is DENIED; the Underwriter defen-

dants' motion for summary judgment is DENIED; defendant Arthur Andersen's motion for summary judgment is GRANTED; defendant Ernst & Young's motion for summary judgment is DENIED; plaintiffs' motion for partial summary judgment is DENIED; and the aiding and abetting claims contained in Count I are dismissed as to defendant Ernst & Young without prejudice. The parties are strongly urged to discuss the settlement of this case and report on the status thereof on October 4, 1994 at 10 a.m.

## *MEMORANDUM OPINION AND ORDER ON RECONSIDERATION*

Named plaintiff Henry T. Endo, on behalf of himself and a class of similarly situated individuals, initially filed a nine-count complaint against defendants, including a claim for violations of § 12(2) of the Securities Act of 1933. Both plaintiffs and defendants previously filed cross-motions for summary judgment. On September 9, 1994, this court denied plaintiffs' motion for partial summary judgment. Plaintiffs have now filed a motion, pursuant to Federal Rule of Civil Procedure 59(e), requesting the court to reconsider its decision as to the elements of proof for plaintiffs' claim brought under § 12(2) of the 1933 Act. More specifically, plaintiffs seek a clarification of the applicability of loss causation to their § 12(2) claim. For the reasons stated below, plaintiffs' motion to reconsider and clarify is granted.

## *ANALYSIS*

[31] In the briefing on the cross-motions for summary judgment, none of the parties raised the issue of whether loss causation is a required element of plaintiffs' § 12(2) claim. This previously unaddressed issue is now before the court on plaintiffs' motion to reconsider and clarify.

Section 12(2) of the 1933 Act imposes liability on any person who "offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact

necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77*l*(2). Section 10(b) of the 1934 Act imposes liability on any person who "use[s] or employ[s], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). It is undisputed that it is fundamental to plaintiffs' § 10(b) claim that plaintiffs prove "loss causation." *See LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). The term "loss causation" means that the investor would not have suffered a loss if the facts were what the investor believed them to be. *Id.* The Seventh Circuit has not decided whether loss causation is also a required element of a § 12(2) claim.

Both the Second Circuit and the Fourth Circuit have held, however, that loss causation is not a required element of a claim under § 12(2). *See Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1305 (4th Cir. 1993) ("A claim under § 12(2) may be grounded on untrue statements and omissions that make a memorandum misleading, whether or not the plaintiff relied on the memorandum or even read it, and may justify rescission, whether or not the plaintiff was damaged."); *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989) (Statutory sellers "may now be liable under Section 12 whether or not scienter or loss causation is shown."). In addition, other courts in this district have also distinguished § 12(2) from § 10(b) as not requiring a showing of loss causation. *See Nielsen v. Greenwood*, 849 F.Supp. 1233 (N.D.Ill.1994); *Coe v. Nat'l Safety Assocs., Inc.*, 137 F.R.D. 252 (N.D.Ill.1991).

In reaching this conclusion, these courts focused on the language and purpose of § 12(2), and found that Congress intended § 12(2) to protect investors from misrepresentations whether or not the misrepresentations caused a decline in the price of the securities. As the Second Circuit stated in

*Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81 (2nd Cir.1988):

> In drafting Section 12(2), Congress obviously sought to provide a heightened deterrent against *sellers* who make misrepresentations, by rendering tainted transactions voidable at the option of the defrauded purchaser regardless of whether the loss is due to the fraud or to a general market decline.

*Id.* at 86 (emphasis in original). In addition, the Supreme Court has recognized that § 12(2) was intended to prevent fraud by shifting the risk of a decline in the value of the security to the fraudulent party:

> We may therefore infer that Congress chose a rescissory remedy when it enacted § 12(2) in order to deter prospectus fraud and encourage full disclosure as well as to make investors whole. Indeed, by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud.

*Randall v. Loftsgaarden*, 478 U.S. 647, 659, 106 S.Ct. 3143, 3151, 92 L.Ed.2d 525 (1986). Therefore, because the weight of authority supports a conclusion that loss causation is not an element of a § 12(2) claim, and the purpose of § 12(2) is to protect investors against false statements regardless of whether the fraud caused a decline in the value of the security, the court finds that plaintiffs may proceed with a claim under § 12(2) without a specific showing that the challenged misrepresentations or omissions actually caused plaintiffs to suffer a loss.[1]

### CONCLUSION

For the reasons stated above, plaintiffs' motion for reconsideration and clarification is GRANTED.

---

**1.** In addition, any statements made by the court in its September 9, 1994 opinion regarding the application of loss causation to plaintiffs' securities claim were not intended to imply that loss causation is an element of plaintiffs' § 11 claim.

As plaintiffs correctly state in their motion to reconsider, loss causation is an affirmative defense under § 11(e), not an element of a § 11 claim. *See* 15 U.S.C. § 77k(e).